No. 21,727.

LUCY A. JAMES, *Appellee,* v. FRANK A. LANE, as Administrator, etc., S. T. BARONS and CORA B. BARONS, *Appellants.*

#### SYLLABUS BY THE COURT.

CONTRACT—*Oral Agreement to Bequeath Property—Specific Performance—Insufficient Evidence.* In an action against an heir at law for the specific performance of an oral contract alleged to have been made between the deceased and plaintiff, by which the deceased agreed to make a will leaving all her property to the plaintiff, it is *held,* on the facts stated in the opinion, that the evidence is not sufficient to sustain a judgment in plaintiff's favor.

Appeal from Rice district court; FRANK F. PRIGG, judge *pro tem.* Opinion filed October 12, 1918. Reversed.

*A. M. French,* of Concordia, *Samuel Jones,* and *Ben Jones,* both of Lyons, for the appellants.

*A. C. Banta,* of Great Bend, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The suit was one for specific performance of an alleged oral contract between plaintiff and her sister, Mrs. F. E. Barons, deceased, by which the latter agreed to make a will leaving all her property to the plaintiff.

Mrs. F. E. Barons, a widow, died intestate, a resident of Rice county, in August, 1914, owning three quarter sections of land in Rooks county, two dwelling houses and a hotel in Lyons, and five or six thousand dollars' worth of personal property. She was indebted to the extent of several thousand dollars. The defendants are F. A. Lane, administrator of her estate, S. T. Barons, her son and only heir at law, known in the family and referred to by the witnesses as "Chip" Barons, and his wife, Cora Barons.

From 1878 until her death Mrs. Barons was in the hotel business, first at Clyde, then at Concordia, and later at Lyons; for several years prior to her death she had been conducting the Interstate hotel at Lyons. Her sister, Lucy A. James, spoken of by everyone as "Aunt Lucy," is past 77 years of age, and not strong mentally or physically; she had lived with

James v. Lane.

Mrs. Barons since 1878, working in the hotels, part of the time as chambermaid or as waitress, receiving her board, clothing, spending money and a home, but no stipulated wages. She was treated as a member of her sister's family, and for several years another sister resided in the same way with Mrs. Barons.

F. A. Lane had lived at the Barons' hotel for a great many years and was a close friend of the family and the adviser of Mrs. Barons in many of her business transactions. While he was proceeding to close up the estate as administrator, the plaintiff, through the assistance of her friend, John F. Starkey, employed Solon T. Gilmore, a lawyer of Kansas City, Mo., who filed her claim in the probate court against the estate for $15,-032, wages alleged to have been earned in the employment of her sister in working about the hotels. The administrator filed numerous defenses to the claim, and when it came up for hearing December 2, 1915, the claim was amended to include an express as well as an implied contract for wages. The administrator was represented by A. M. French of Concordia; the heir at law, Chip Barons, was represented by Samuel Jones of Lyons; and the plaintiff appeared by Mr. Gilmore. The matter of plaintiff's claim and the making of some provision for her support were discussed by the probate judge and the attorneys, and the hearing was passed until the next day to see if the parties could agree upon a settlement. On February 3 a written agreement of settlement, made in triplicate, was signed by F. A. Lane as administrator, Chip Barons and his wife, and by Aunt Lucy, by which two dwelling houses and the Interstate hotel at Lyons were to be conveyed by the heir at law to F. A. Lane as trustee for Aunt Lucy; so much of the proceeds of the real estate as was necessary was to be used to provide her a home, board, clothing, medical care and attention as long as she lived, and at her death the trustee was to turn the property over to Chip Barons. The probate judge was advised of the terms of the settlement, and it was presented to and approved by him; a journal entry was recorded showing that the court found the settlement was equitable and just between the parties, and judgment was rendered confirming the settlement and barring Aunt Lucy from all other claims against the estate. The trust deed was executed, and the administrator pro-

ceeded to carry out the terms of the trust. He borrowed money on some of the property, paid taxes, made numerous payments of cash to the plaintiff at her request, furnished her board, and paid her accounts at the stores for clothing and other necessities. She fell and fractured her hip, making her a permanent cripple, and she was in a hospital for ten weeks, with a special nurse when required, and was furnished proper medical care and attention.

The plaintiff became dissatisfied with the terms of the settlement, and on June 28, 1916, this suit was filed by her present attorney, charging a conspiracy between the trustee, his attorney, S. T. Barons and his attorneys, plaintiff's attorney, Solon T. Gilmore, and the probate judge of Rice county, with the intent to defeat her rights, and alleging that they compelled her to sign the agreement through duress, and she asked that it be held void. She also alleged that in the lifetime of Mrs. Barons the latter had verbally promised that if she would continue with and work for her as long as she lived, Mrs. Barons would at her death will to plaintiff all the property of which she died seized. Plaintiff prayed for the specific performance of this verbal contract.

The answer was a general denial, and a plea that plaintiff had elected her remedy when she presented her claim for wages; that the decision of the probate court is *res judicata;* that she had confirmed and ratified the settlement by accepting its benefits and was estopped to deny its validity. The answer set out the large number of monthly payments made after the agreement was entered into, and even after the bringing of this action, and further alleged that the settlement in the probate court was equitable and just, and asked that it be held valid and binding upon the plaintiff. Upon these issues there was a trial and a judgment for plaintiff, from which defendants appeal.

The trial court finds that plaintiff made no claim to the probate court or to her attorneys that her sister had promised to make a will in her favor; that there was no conspiracy to defraud her as alleged, but that she was induced to sign the agreement solely by the threats and coercion of her attorney, Gilmore, and her weakened condition physically and mentally; and that before she signed the agreement she stated she wanted

F. A. Lane to be named as trustee. The court then finds that Mrs. Barons promised plaintiff that if she would live with her and perform services in her hotels during her lifetime, she would give all her property to plaintiff by will provided she died before plaintiff, and further that plaintiff performed the services. There is a finding that the proceedings in the probate court were had without evidence being introduced, except the written agreement, and that the proceedings and judgment were based on the agreement.

There is force in defendants' contention that plaintiff should be held bound by her election of remedies. Her claim in the probate court was predicated both upon an implied and an express contract to pay her reasonable wages for services rendered; and whether she relied upon an express contract or one raised by implication, her remedy was based upon the theory that the title to the property vested in the heir at law on the death of Mrs. Barons, subject to Mrs. Barons' indebtedness. Her present action would appear to be an inconsistent remedy, because it proceeds upon the theory that the title to all the property passed directly to plaintiff upon her sister's death.

In *Moline Plow Co. v. Rodgers*, 53 Kan. 743, 37 Pac. 111, the plaintiff brought replevin to recover property delivered to a vendee under a conditional sale, the vendor retaining a right to elect to take the goods unsold as its own property. Creditors of the vendee attached the property, and plaintiff brought an action in another state against the vendee to recover the purchase price of the sale. It was held that the two remedies were inconsistent, because the plaintiff could have no claim for the value unless the title had passed to the vendee, while if the title had passed, plaintiff had no right to the goods. The action in the other state was held an election of remedies which prevented the plaintiff from maintaining the replevin action. To the same effect see *Bank v. Haskell County*, 61 Kan. 785, 60 Pac. 1062; *Ullrich v. Bigger*, 81 Kan. 756, 106 Pac. 1073, and cases cited in the opinions. In the Ullrich case it was held that the action was doubly barred—by the election of an inconsistent remedy, and by prosecuting that remedy to a judgment. When plaintiff chose her remedy in the probate court she necessarily was aware of all the facts upon which her present suit is based.

We prefer, however, to rest the decision upon the specific

ground that there was no evidence which would justify the court in finding that the contract relied upon by plaintiff was ever made. No competent evidence was offered to show the existence of any contract between her and Mrs. Barons; and, if there could be said to be circumstances sufficient to raise the implication that some kind of a contract existed with reference to the disposition of the property of Mrs. Barons at her death, no witness testified what the terms of such contract were. The following question was asked of plaintiff:

"Now, Aunt Lucy, I will ask you whether or not you ever had an agreement with Mrs. Barons, during her lifetime, with respect to the disposition of her property at her death?"

The question was objected to because it called for an answer in respect to a transaction or communication had with a deceased person in an action where the adverse party is the administrator or heir at law. (Gen. Stat. 1915, § 7222.) The court permitted the plaintiff to answer the question "yes" or "no," and she answered it in the affirmative. Over defendants' objections the court also permitted her to testify to the services rendered by her, and to the fact that she had not been paid. The ground of both rulings was stated by the court to be that the questions did not necessarily call for transactions, since the answer might be that there were none.

The testimony was not competent. Besides, it was not offered upon any theory that it might establish the fact that no transaction or communication was had with the deceased. Its admission in a trial before the court would not necessarily constitute reversible error, unless it appeared from the record that it furnished some basis for the court's finding. Moreover, it did not tend, even if competent, to establish the existence of the contract upon which plaintiff relies. And we have been unable to find in the record any evidence showing an agreement or contract that deceased would leave all her property, or any part of it, to the plaintiff at her death. On the contrary, there are many circumstances in the case which, in our opinion, indicate forcibly that the claim was an afterthought. No witness ever heard of such a contract until after the plaintiff became dissatisfied with the terms of the settlement; and in all probability it originated in the mind of some other person. Plaintiff's main witness was John F. Starkey, who had been em-

ployed as a clerk in the Barons' hotel at Concordia and lived at the hotel from 1878 to 1904. He was very friendly to Aunt Lucy, although he had seen her but twice for a great many years. After the death of Mrs. Barons he wrote about twenty letters to plaintiff offering to aid her in procuring compensation for her services. He was living at Kansas City, Mo., and he made arrangements for the employment of Mr. Gilmore to represent the plaintiff. He repeatedly assured her in the letters that she would be successful. In one of them he suggested that as soon as she got a settlement she could come to Kansas City and start a business that would make her independent and comfortable. He testified to two conversations with Mrs. Barons at Kansas City. The last one occurred about 1909. His testimony is:

"I asked Mrs. Barons in a visiting way, as I naturally would,—I said, 'Mrs. Barons, you and I are getting pretty well along in years,' and I think I said—I cannot remember exactly the words I used, but as near as I can remember, it was this: 'You have got quite a bit of property; what do you intend to do with it after you are gone?' I knew her relatives were all dead except Lucy.

"Q. And what did she say in answer to that? A. Well, she said if she died before Miss Lucy,—I think that is the way she said it, I am not positive as to the exact words, but in a general way that was the conversation,—if she died before Miss Lucy she would get what was left, or the bulk of it at least; and I think she also said she was going to remember a niece of hers.

"Q. What did she say about Chip in that conversation? A. I asked her if Chip would get—if she was not going to leave the property to Chip. And she said, 'Not on your life; Chip has got all he will ever get from me.'

"Q. Did she say she would not give this property to Chip? A. Yes.

"Q. What did she say as to that? A. That she would not, on account of his drinking and gambling and running through with it."

His testimony is that he did not think the word "will" was mentioned in the conversations, and that in his talks with the attorney, no reference was made to any contract; that he had never heard of it. There was testimony of substantially the same kind of a conversation between Mrs. Barons and the Wilfongs, in which she expressed the intention to leave her property to plaintiff and to disinherit her son, but the testimony does not tend to show the existence of a contract to will her property to the plaintiff.

35—Kan.—3099.

In plaintiff's correspondence with Gilmore she makes no mention of any contract about a will, but says that her sister had always said she would have pay for her work when the estate was settled up at her sister's death, and she wrote that Mr. Starkey was a good witness for her, and that there were many others who would testify in her behalf.  Moreover, after her sister's death her sole complaint had been that she was entitled to keep some jewelry which formerly belonged to Mrs. Barons.  In the first letter written to Gilmore she states that the night before her sister went away to the hospital for the operation which resulted in her death, she put in plaintiff's hand her diamond rings and earrings and said: " 'Now you have got my diamonds, go and put them away in your room and if I do not come back they are all yours' . . . and then she went away to the hospital at Kansas City, she died in August, and I put them in the bank with some of her other jewels and the son went and got a lawyer to get them out, said they did not belong to me; . . . They are still in the bank waiting to see what I am going to do."  In this same letter, after stating that Mrs. Barons' property was valued at about sixty or seventy thousand dollars and that the son had not earned one penny of it, she states that Mrs. Barons "did not make a will as she did not think but what she would get well and come home, but she did not."

Mrs. Barons was going away and realized that she might never return, and yet it appears that she made no reference to the will which plaintiff claims she had promised to execute, whereby everything would go to plaintiff; she simply gave plaintiff some jewelry.  This fact, together with what the plaintiff says further on in the same letter about her understanding that she should receive pay for her work when her sister died, shows conclusively, in our opinion, that when plaintiff's letter was written to her attorney the thought of any agreement with reference to the making of a will had never occurred to her.

In a written opinion the trial court recognizes that the testimony of the plaintiff must be ruled out, but apparently proceeded upon the theory that it became the court's duty to seize upon any circumstance consistent with the existence of

such an agreement and infer its existence, because of the inherent difficulty under which the plaintiff was placed by the statute. After stating that the court fully appreciated the force of the doctrine as to the danger of relying on casual statements of parties since deceased to prove such a promise, the opinion proceeds: .

"But in cases like the case at bar in which people do business in a careless and informal manner, it often, we might say, usually happens, that promises made by persons since deceased cannot be proven by any better evidence than the class of evidence above referred to. This being true, the courts must be governed by the best evidence obtainable. . . . The court must consider the rule of law by which the plaintiff is prohibited from giving her testimony as to such promise having been made by the deceased to her. Such evidence was offered by the plaintiff, objected to by the defendants, and the objection, of course, sustained by the court. This leaves to plaintiff no other evidence than the circumstances and the evidence of others than the plaintiff of statements made by the decedent."

After referring to the fact that the evidence of defendants shows that F. E. Barons intended to make provision for Lucy, but she very unwisely left the wish to be carried out by her son and heir without having such wish expressed in such a manner as to be binding upon him, the opinion says: .

"If F. E. Barons promised to leave her property to her sister Lucy there is ample consideration shown by the evidence for such promise. Lucy, as shown by the evidence, had labored in the hotels of F. E. Barons for many years; she had not received wages as other employees were paid; she could not recover wages unless there was an express contract for pay as she was a sister of F. E. Barons and lived as one of the family. In the absence of express contract for wages, she is without remedy unless there was a promise to provide for her by will. The fact of the plaintiff's long service for her sister, her failure to demand or to receive wages, her physical and mental condition, her dependence on F. E. Barons, the disposition of her sister to provide for her needs, both during her lifetime and after her death, are circumstances tending with great force to prove that F. E. Barons had promised to leave her property after her death to her sister Lucy."

The opinion then states the conclusion reached by the court, that in her lifetime Mrs. Barons agreed on the conditions stated, that she would will and devise to her sister all the property she possessed at the time of her death.

All these circumstances together are insufficient, in our opinion, to support a finding that deceased promised to will all

her property to plaintiff.  Why all her property?  Why not merely enough of it to insure Aunt Lucy the same care and comforts in her old age that she had been furnished in Mrs. Barons' lifetime?  It was necessary for the court, not only to assume the existence of a contract to leave some property to plaintiff, but to assume that the contract was to make a will leaving all her estate to the plaintiff.  The inference or implication that a specific contract of this nature and importance was entered into cannot be rested upon such doubtful evidence; and besides, to do so ignores the statement of Starkey to the effect that in the conversation he claims took place in 1909, Mrs. Barons expressed the intention to leave a portion of her estate to a relative in the east.  Mrs. Barons, in casual talks with friends and acquaintances, may often have expressed an intention not to leave any part of her estate to her son, but that would not evidence the existence of an agreement to make a will in Aunt Lucy's favor.  The law recognizes that such expressions of intention are not binding upon the one who makes them.  An expression of such an intention would be entirely consistent with the existence of an agreement to leave the property to Aunt Lucy or to someone else; but the mere fact that the intention was expressed not to leave Chip any part of the estate is not sufficient to support an inference that she agreed to make a will and leave it to Aunt Lucy.  It is doubtless true that if Mrs. Barons had persisted in the intention to leave nothing to her son, she would have made some provision by will or otherwise for the care of her sister.  Concede that she often declared she would leave nothing to the son, as any mother might have done, she changed her intention and in later years decided to leave him all her property, notwithstanding her objections to his habits of life.  The evidence and the court's findings are that she believed her son would provide for plaintiff.  We are impressed with the force of the testimony of Mr. Jones, the attorney for the heir at law, who knew all of the parties and who was the legal adviser of Mrs. Barons.  His testimony is that she sent for him a short time before her death and asked what would become of her property if no will were made, stating she had always taken care of Aunt Lucy and knew that her son would continue to do so; that upon being informed by her attorney she expressed herself satisfied with

the disposition of her property under the statute. This testimony is certainly stronger evidence against the existence of the contract relied upon than the mere expression of her intentions, made in casual conversations years before, is that a contract of that nature existed.

In *Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743, it was held that "when a definite contract to leave property by will has been clearly and certainly established, and there has been performance on the part of the promisee, equity will grant relief, provided the case is free from objection on account of inadequacy of consideration and there are no circumstances or conditions which render the claim iequitable" (syl. ¶ 1), and in *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396, it was said:

"An oral agreement that operates as a transfer of land must, of course, be made out by clear and satisfactory proof, but it is not essential that it be established by direct evidence. If the facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be no inequity in its enforcement, it is enough." (p. 700.)

These rules have been followed and adhered to by us in other decisions. The courts, generally, recognize that while the existence of such a contract, like any other fact, may be proved by circumstantial evidence, there must be such facts and circumstances as indicate convincingly that the contract was made, and that claims of this nature should not be sustained upon doubtful proof, because it is easy to color testimony or to fabricate evidence which lies almost wholly in the control of persons testifying concerning casual statements made by a decedent in his lifetime. Many courts have characterized claims of this nature as inherently dangerous, although not refusing to enforce them where the proof is clear and satisfactory. (*Clark v. Turner*, 50 Neb. 290.)

Besides, the enforcement of such agreements must not be inequitable. (*Anderson v. Anderson*, supra, and *Bichel v. Oliver*, supra.) There are no controlling equities in plaintiff's favor. On the contrary, her claim to all Mrs. Barons' estate, as against the son and heir at law, is inequitable and should not be sustained upon the character of testimony offered. The circumstantial facts are against her claim. The evidence is undisputed that Mrs. Barons was always anxious and solicitous for the assured comfort and care of Aunt Lucy in case the latter

survived her. There is abundant evidence that she wanted the plaintiff to have the same care after her death that she had provided in her lifetime. But that Mrs. Barons, a woman of sound business judgment and experience, ever agreed to make, or thought of making, a will leaving all her property to her sister, inexperienced in business affairs, weak mentally and physically, and to disinherit her own son, seems improbable.

The weight of the testimony is against the claim of the plaintiff that she was coerced into signing the agreement of settlement. Mr. Stahl, a local attorney who was present, testified that she objected to the settlement for the reason she said she was to have sufficient money to keep herself as long as she lived, and Mr. Gilmore told her she was getting that, and she replied: "Yes, but how do I know that I am? You can't stay here, and Chip won't let me have it. Chip will drink it up"; that Mr. Gilmore then told her that there would be a trustee so that none of the funds would come through Chip's hands, and that her care would be a lien on the property; that, after agreeing to the matter, she herself suggested Mr. Lane as trustee. Mr. Lane testified that the evening before the trust deed was made, he talked with her and Mr. Gilmore, and she wanted him to be trustee. He objected, and they talked for over half an hour, and he finally told her that on account of being connected with the family he would accept it. She advised with two of her business friends before signing the agreement the next morning.

Mr. Jones, who knew Aunt Lucy ever since she had been in Lyons, testified to the manner in which the question of making a settlement in the plaintiff's favor was taken up with the probate judge and the attorneys, and the fact of the intention of Mrs. Barons that Chip should provide her sister with a proper home was conceded, also that Chip was addicted to some bad habits and might squander the property, and also that plaintiff was not capable of controlling or managing it herself. He submitted a proposition "to place this property in the hands of a trustee so that it could not be squandered either by Chip or by Aunt Lucy or by anybody else, and that the proceeds should be devoted to her care and support; that she should have a home, and it would be tied up in such a way, during her lifetime, that Chip could n't squander it, and then it would be for the benefit

of him and his wife at last. . . . I was not actuated by any desire to defeat the right of Lucy A. James at the time I made that contract, I was rather anxious to protect her rights—I considered it equitable, fair, and just, and carrying out the intention of F. E. Barons, deceased, as expressed to me, and, in view of my knowledge of the parties, I felt it conserved the property. . . . In fact, I was anxious to do it, as it was so in accordance with her wish, as she had expressed it, except that she did n't express any desire to burden Chip with a binding obligation to take care of Lucy. Chip did not want to do it. . . . He wanted to be free. That was the objection that he made to signing it; and I labored with him and told him that that was his mother's wish; and he would say all the time: 'I expect to take care of Lucy and furnish her with a home.' And I said: 'We will just put that in writing'; and he was quite rebellious about it, and I had a long argument with him . . . and we labored with him for a great length of time to get it done."

The probate court, being fully advised as to the undisputed facts and reasons for the settlement, ratified and approved it. The settlement seems to us fair and equitable between all the parties, and, on the other hand, the enforcement of the contract under which plaintiff claims would be manifestly inequitable. The controlling consideration, however, is that the existence of the contract is not sustained by sufficient evidence, and it follows that the judgment is reversed and the cause remanded with directions to enter judgment for the defendants.