No. 29,182.

HARRIETT B. SAMPLE, *Appellant*, v. GABRIELLA REED et al.,
*Appellees*.

(287 Pac. 614.)

Opinion filed May 3, 1930.

*James E. Smith, Fred S. Jackson,* both of Topeka, *T. C. Forbes* and *Carl C. Chase,* both of Eureka, for the appellant.

*Homer V. Gooing,* of Eureka, *David F. Carson* and *William Drennan,* both of Kansas City, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: These cases involved the title to tracts of land and the consequent rights to oil royalties, bonuses and moneys received for oil from those lands. Robert Bryden and his wife, Lydia, came to Greenwood county in 1882, and they took into their home three young girls, the daughters of Charles C. Muninger, a brother of Mrs. Bryden, soon after the death of the mother of the children. It was the intention of the Brydens to rear, educate and provide for the three sisters, Lydia, Harriett and Gabriella, as if they were their own, and this purpose was carried out. For certain reasons Gabriella was a favorite of the Brydens, and before the death of her mother they had expressed a desire to adopt her as their own child,

but consent to do so was not given. While the three sisters took the name of Bryden instead of Muninger, they were never legally adopted by the Brydens. They remained as a part of the family, however, and in 1902 Harriett was married to J. S. Sample, in 1905 Lydia was married to A. A. Nixon, and in 1907 Gabriella was married to L. F. Reed. Robert Bryden, it appears, acquired several tracts of land, one of which is said to embrace more than 1,500 acres, and had inherited a quarter section of land owned by his wife, which adjoined that owned by him, and together they were designated as the Burnt Creek Ranch. Bryden owned another tract of land of 560 acres, which was known as the Bachelor creek ranch, which was of a better quality than the other land. He had also acquired real estate in the city of Eureka and had established a home there in 1903. During that year his wife became ill and was taken to a hospital in Wichita, where she died about March 14, 1913, at the age of seventy-three years, leaving Robert Bryden as her only heir. Shortly before the death of Mrs. Bryden and while she was in the hospital some statements were made by her with reference to the disposition of the Bryden property and of her desire that it should go to the three sisters. Whether there was a contract made with respect to the disposition of the property is a contested question depending upon the evidence and the findings of the court.

About a week after the death of his wife Bryden signed three deeds containing no reservations or exceptions. In one, one-half of the Burnt Creek Ranch was described and Harriett Bryden Sample was named as the grantee. In another deed the remaining half of that ranch was described and Lydia L. Nixon was named as grantee, and a third deed was signed purporting to convey the Bachelor creek ranch to Gabriella Reed. These deeds were executed without the knowledge of the grantees therein named, and without any valuable consideration having been paid. When executed Robert Bryden took the deeds to L. F. Reed, left them with him with directions to keep them until he might call for them. Reed took the deeds and put them among his private papers in a lock box in a bank. Soon after the execution of the deeds the grantees named learned of their execution and that they had been placed with Reed. In the early part of 1918 oil was discovered in the region of the lands in question and Bryden executed a number of leases on parts of the Burnt Creek Ranch and a producing well was drilled on the land described

in the deed of Mrs. Nixon. At one time Bryden received a cash bonus of $8,000 on a lease which he had made, and this bonus was divided by him into three equal parts and given to each of the three sisters, taking from each her promissory note. These promissory notes were never paid and Bryden made no effort to collect them. Leases continued to be made from time to time by Bryden on these lands until as late as 1923, and during all this time, covering a period of about seven years, the parties herein knew of the oil operations and that Bryden was in control of the lands and was collecting and receiving large sums of money from oil royalties, to which plaintiffs made no objection and had permitted him to make the leases, receive and handle the oil obtained from the lands without consultation with them.

After the discovery of oil and until his death he gave each of the three sisters $200 per month, and also furnished money to them to be used in building or improving their homes. He paid to plaintiff, Harriet Sample, in the neighborhood of $50,000, and to Lydia L. Nixon substantially the same amount. These gifts were received and accepted by the plaintiffs as gifts and the plaintiffs knew at all times that the bonus money and royalty money were the proceeds of the leases that Bryden had made. No claim to the oil royalties was ever asked by the plaintiffs, and no claim for an accounting of the bonus or royalties obtained by Bryden was ever asked. In March, 1918, Bryden obtained the 1913 deeds to Harriett and Lydia, from Reed, and caused a new deed to be drawn which described all the land in the Burnt creek ranch, giving it jointly and equally to all of the three sisters. This deed was delivered to Reed without conditions and to be by him delivered immediately after the death of Bryden to the grantees. At that time he intended to pass a present title to the grantees, postponing only their right of enjoyment until after his death. In September, 1920, Bryden had been told by one of his friends that the recording of such a deed was necessary to convey title and he interviewed an attorney and was advised that the deeds in custody of Reed should either be recorded or they should be placed in the hands of a bank showing the conditions under which they should be held. The deeds were then obtained from Reed, including the one of 1913 to Gabriella, and placed in the bank and a receipt given for them. When placed in the bank an error was discovered in a description of land, and under date of Sep-

tember 9, 1920, a new deed was executed correcting the description. In 1916, and after a serious sickness, Bryden asked Reed to record the deeds to Gabriella, and this was done. He made a will on November 4, 1919, disposing of his personal property and without mentioning any real estate. He died on August 4, 1926, and the estate is in the course of administration in which a large amount of money is in the hands of the executor, the proceeds of the oil royalties from the Burnt creek ranch. On the claim that there was a contract between Robert Bryden and his wife with reference to the transfer of their property to the three sisters the court found:

"The court is unable to find from the evidence that there was any contract or understanding between Robert Bryden and Lydia Bryden made or had at or before the death of the said Lydia Bryden, with reference to the inheritance, transfer, gift or other disposition of any property belonging to her, or any property that Robert Bryden then owned or might own at any time, and is unable to find that there was any contract or agreement that in consideration of Lydia Bryden's making no disposition of her property, Robert Bryden, after her death, would deed or give or will his property to Harriet B. Sample, Lydia L. Nixon or Gabriella Reed."

Upon the testimony the court concluded as a matter of law that the two deeds of 1913 in which the plaintiffs were named as grantees were never delivered by Robert Bryden with the intention of conveying to the grantees any right, title or interest in the real estate described therein, and that the deed of 1918 was delivered and became effective on March 1, 1918. The court concluded that the two deeds of 1913 to Lydia L. Nixon and Harriett B. Sample were never delivered to L. F. Reed or to anyone else with the intention of conveying title to the land to them, and that they were not entitled to recover anything under those deeds. The deed of 1918 was held to be an effective conveyance, as Bryden had parted with possession and control of the instrument and had conveyed a present interest in the lands with the intention that only the enjoyment thereof should be postponed until his death. The deed of 1913 to Gabriella was held to have been delivered on March 1, 1918, with the intention that she should go into immediate possession of the premises. As to the oil and gas leases the court found:

"Robert Bryden was entitled to the use and benefit of and was the absolute owner of all cash bonus received for any oil and gas lease executed and delivered by him prior to March 1, 1918, and he was the absolute owner of all rents and oil and gas royalties received by him or produced prior to his death under any oil and gas lease or leases executed and delivered by him

prior to March 1, 1918, and the executor of his will is not required to account to the plaintiffs for any money or property in his hands that may have been received from any such source, or any property owned by Bryden at his death that was the proceeds of any money received from such sources.

"All cash bonuses received for oil and gas leases executed and delivered by Bryden after March 1, 1918, and all rentals and royalties received by Bryden under any leases executed by him after said date was the property of and owned jointly by the plaintiffs and Gabriella Reed, in equal shares, and Robert Bryden received and held the same in trust for them during his lifetime, and the executor of the Bryden will must account to each of the plaintiffs for one-third of any money or property received by Bryden from such sources. Bryden was entitled to retain the corpus of said fund only during his lifetime, and any interest or profits earned thereon during his lifetime was his sole property and such interest or profits should not be treated as a part of such trust fund. Any money or property paid or given by Bryden during his lifetime to either of the plaintiffs or Gabriella Reed or L. F. Reed was paid or given to them as gifts and were so intended by Bryden and received by them as such. Such gifts and any other gifts or donations or expenditures made by Bryden should be held and considered as having been made from his own separate estate and not from said trust fund which he held for the use and benefit of the plaintiffs and Gabriella Reed."

Judgment was accordingly given.

Plaintiffs concede that the case must turn upon the findings of fact supported by evidence, but it is contended that material findings made are without support and some of them contrary to the evidence. It is urged by plaintiffs that under the testimony an understanding and agreement were entered into between Bryden and his wife, prior to her death, by which the property of both was to be given in equal parts to the three sisters, and that this agreement was carried out by Bryden when he executed the deeds of 1913 and placed them in the custody of L. F. Reed. Considerable testimony was offered as to statements made by Mrs. Bryden as to the property while she was in the hospital and just prior to her death. The testimony, however, fails to show the making of a contract between Bryden and his wife to convey the property to the plaintiffs. Aaron Nixon, the husband of Lydia, testified that Mrs. Bryden said to him in the presence of his wife, that "Uncle Bob (her designation of her husband) and I decided that we have given the Piatts and other relatives enough, and I want my stuff to go to the girls, and he decided to put his in the same; that we decided the property should go to the three girls." It is conceded that Mr. Bryden was not present when these remarks were made with the Nixons. Mrs. Sample testified that she heard the conversation with Nixons, but

they had stated that the only persons in the room with Mrs. Bryden when this conversation occurred were Mr. and Mrs. Nixon alone, who said that Mr. Bryden was not in the room at that time. There was testimony that after the death of Mrs. Bryden, Mr. Bryden said he and his wife had talked over the matter of dividing the property, that his wife wanted her property divided among the three girls and he told her if she did that he would let his go the same way and remarked, "We were very near putting it off too long." It was testified at other times he had indicated how the land was to be divided. That certain parts would belong to plaintiffs when he was through with it, to others he said the property was to go to the three girls, and that he had given the deeds which he had executed to L. F. Reed, that he would not be here much longer to use the property and some other similar expressions. It may be noted that Mr. Nixon recalled that Mrs. Bryden had said that she did not want Lydia Nixon, his wife, to work so hard, and Mr. Sample also testified that he heard Mrs. Bryden say to her husband at one time, "Whatever you do I want you to take care of Hattie," Sample's wife. The question of fact as to whether a contract to convey this large estate was established by proof, was given a negative answer by the trial court. It is necessary that such a contract be shown by clear and convincing evidence. From the facts and circumstances of the case we can readily understand that the court was not convinced nor satisfied that a contract of this nature and importance had been entered into by Bryden and his wife. Evidently they had talked of a purpose to leave their property to the three sisters instead of to relatives, but expressions of such an intention and the testimony in this case falls short of establishing a binding contract to convey. (*McKeown v. Carroll,* 102 Kan. 826, 172 Pac. 525; *James v. Lane,* 103 Kan. 540, 175 Pac. 387; *Nash v. Harrington,* 110 Kan. 636, 205 Pac. 354.) The claimed contract was that the property was to be equally divided between the three girls, but the testimony shows a purpose to prefer Gabriella, the one first taken into their home by the Brydens, and whom they sought to adopt. Upon the testimony the court rightly found that at all times it was the purpose of Bryden that Gabriella Reed should receive a greater part of his estate than her two sisters, and it appears she was given a larger part when the actual conveyance was made. The finding of the trial court that a binding

contract between Mrs. Bryden and her husband to convey the property was not made cannot be set aside.

There remains the question whether there was a delivery to the plaintiffs of the 1913 deeds. These instruments were drawn and signed by Bryden and were delivered to L. F. Reed, the husband of Gabriella, for safe-keeping. Whether there was a delivery of the deeds depends largely upon the intention of Bryden in placing them in the hands of Reed. Did his words or acts or both manifest an intention to surrender control of the deeds and to part with the title to his lands? The burden rested upon plaintiffs to show an absolute and unconditional delivery of the instruments. The testimony of Reed, the depositary, was that when Bryden handed him the papers, he said:

" 'Here, Reed, are some papers. I want you to take charge of them. I want you to put them in your lock box where they will be absolutely safe and say nothing to any person about them,' and he sat down in the office and had a talk for an hour or longer in regard to the place. He said, 'This isn't dividing it between them the way I intended to.' Then, he did refer to them as deeds. He said, 'These are deeds to my land, but this is not dividing it the way I want it to go, but owing to the location of the land, the Bachelor creek farm and the land out there, it seems the most convenient way to divide it to make it worth while for anybody,' but he said, 'I am going to go right ahead doing business just like I expected to live a hundred years. I am going to handle cattle and I expect to use this land. I want to go ahead and do business just like I expect to be a hundred years old and I don't know what turn may come. It might be best to sell the land.' He said, 'I really believe if I would sell it and put it into bonds, it would be less trouble to the girls than if I would leave it in the land,' but he repeated, 'I want you to take them and put them in the box where they will be absolutely safe and say nothing to any person about them.' "

Further along in his testimony, speaking of Bryden, he said:

"He said something to me about the possibility of wanting the deeds again. He said, 'I am going right on. I may sell the land. I am going to go ahead and do business, just like I expect to be a hundred years old. I don't know what turn may come. I may sell the land.'

"I was given to understand those were his papers, and I was to keep them subject to his orders, all of the time."

It is said that there is no evidence to support the finding of the court that the deeds were to be held by Reed until Bryden called for them. The testimony, however, last quoted is substantially the equivalent of the expression used by the court. There is sufficient testimony to support the finding of the court that Bryden never in-

tended to surrender the possession and control of the deeds he had prepared and placed in the custody of Reed. He not only kept absolute dominion of his lands, but he executed leases of them, and his statements to the depositary manifested an intention to retain the title to the lands when he told Reed that the papers were his own and they were to be kept subject to his orders as he might want to sell the land, and further that he was going to go ahead and do business on the theory that he would live to be one hundred years old. He said, also, that he did not want to go out of the cattle business, and it appears that he did go on for years afterwards exercising the rights of an owner and doing so without challenge by the plaintiffs or any claim made by them that they had any title to the land or any claim upon the oil royalties under the leases he had executed or the bonuses paid by the lessees. There is evidence to show that Bryden never intended to relinquish control of the deeds and there was never a time when he could not have reclaimed them, and it is well settled that unless there is an intent of the grantor to surrender control and an understanding that the depositary is receiving the deeds for delivery to the grantee, there is no delivery in law. (*Bremyer v. School Association*, 86 Kan. 644, 122 Pac. 104; *Alward v. Lobingier*, 87 Kan. 106, 123 Pac. 867; see Note in 56 A. L. R. 746.) Since there was no delivery of the deeds and no parting with the ownership of the lands, Bryden, of course, had the right to the oil derived from these lands and the bonuses paid by the lessees until the actual conveyances were made and the title transferred. This holding practically determines the case.

There is some discussion of the question and a strong argument made that the plaintiffs were estopped to claim the oil royalties and other moneys paid under the leases, as the plaintiffs had known for years that Bryden was leasing the lands, collecting royalties and they never had claimed any right to the royalties or bonuses. They knew that Bryden was paying out large sums of money in donations to charities and in gifts to plaintiffs and others, of the moneys obtained from the oil. However, it is unnecessary to determine the questions raised as to estoppel, as Bryden's ownership of the lands entitled him to the products of them and is sufficient to uphold the judgment rendered by the trial court.

The judgment is affirmed.