No. 34,373

Vernie Eva Hush, Roy Gardner Healy and Dwight Orris Healy, *Appellants*, v. Addie Ruth Reeder, Sydney Grace Bowen, Lucretia M. Higbee, Clifton R. Healy, Vaneta Locke, Clarence Lee Foster, Lloyd Edgar Foster, Zadia Lula Huston, Velma A. Foster and Zelma A. Foster, *Appellees*.

(95 P. 2d 313)

Opinion filed November 10, 1939.

*D. J. Sheedy*, of Fredonia, for the appellants.

*E. W. Grant*, of El Dorado, for the appellees.

The opinion of the court was delivered by

Harvey, J.: This was an action for the partition of two 80-acre tracts of farm land in Butler county. The titles were of record in the name of Clifton Dwight Healy, commonly known as C. D. Healy, at the time of his death, intestate, July 24, 1929. Plaintiffs are the children of C. D. Healy by his second wife. Defendants are his children and the children of a deceased child by his first wife. They claimed title to the land to the exclusion of plaintiffs by virtue of a deed executed by C. D. Healy in 1910 and which was found in his safety-deposit box in the bank after his death, and which defendants obtained possession of and caused to be recorded. The controverted question was whether the deed had been effectively delivered by C. D. Healy in his lifetime. The trial court found it had been so delivered and rendered judgment accordingly. Plaintiffs have appealed and contend there is no substantial competent evidence to support the finding and judgment of the trial court, and contend, also, that the court erred in the admission of evidence. Counsel for defendants has filed no brief on their behalf in this court, but wrote our clerk that he regarded the judgment appealed from as one based upon conflicting parol evidence of a character which this court uniformly does not disturb. Because of the nature

of the question presented for our decision, and the absence of a brief for appellees, we have sent for and considered the original files and the transcript of the testimony.

C. D. Healy acquired title to 320 acres of land, which included that in question, in 1873, and apparently he and his first wife lived upon it until her death sometime in the early 1880's. To that union six children were born. One of them died, leaving no surviving spouse or children. Another one of them, Alma, became the wife of C. E. (Gene) Foster and died February 24, 1919, intestate, leaving as her heirs her husband and six children.

C. D. Healy married a second time about 1886. To this union three children were born. They lived upon this land until about 1900, when they were divorced. The wife was given the custody of the three children, then minors, and two 80-acre tracts of the land. C. D. Healy retained title to the other two 80-acre tracts now involved in this action. About 1908 C. D. Healy moved to Louisiana, where he thereafter made his home. He was married there to his third wife early in 1910. No children were born to that union, and her death preceded his. After he moved to Louisiana, for a number of years he had his son-in-law, Gene Foster, attend to some of his business in Kansas when he was away. After the death of Gene Foster's wife, in 1919, he moved to Newton, where he lived with his second wife. Thereafter C. D. Healy had his grandson, C. L. (Lee) Foster, transact some of his Kansas business. Through all these years while he was living in Louisiana he rented these lands, collected the rent, and paid the taxes. Each summer he spent from a few weeks to several months in Kansas, and at those times transacted his own business.

The petition in this action, filed May 31, 1930, contained the essential allegations for the partition of the land and alleged the shares of each of the plaintiffs and of the four defendants, who were children of C. D. Healy, namely, Addie Ruth Reeder, Sydney Grace Bowen, Lucretia M. Higbee and Clifton R. Healy, to be an undivided one-eighth, and the shares of each of the other defendants, being the six children of Alma E. Foster, deceased, a daughter of C. D. Healy, to be an undivided one-forty-eighth. The real property described included these two 80-acre tracts of land and other real property. The answer admitted the allegations of the petition as to relationship, and that the property other than these two 80-acre tracts was subject to partition in the shares alleged, but denied

that the plaintiffs had any interest in the two 80-acre tracts, and alleged that on or about March 21, 1910, C. D. Healy and his then wife executed a general warranty deed for the two 80-acre tracts to the five then living children by his first wife, naming them, and an undivided one-fifth to each, and "that said deed was thereafter and in the lifetime of the said Clifton Dwight Healy delivered to the defendant Addie R. Reeder and Eugene Foster for the defendants herein." An amendment to the answer alleged in some detail that the delivery of the deed by C. D. Healy was in the year 1910 or 1911 and was consummated at that time by handing it to Gene Foster and telling him that he "was to keep and hold said deed, and after the death of Clifton D. Healy hand it to the persons named therein as grantees"; that Foster took the deed; that later he moved to Newton and for a time did not have a safety-deposit box, and learning that C. D. Healy did have such a box, Foster placed the deed in the safety-deposit box of C. D. Healy, and that some months prior to his death C. D. Healy gave the keys to his safety-deposit box to Addie Ruth Reeder and to Lee Foster and caused the bank to be notified that they each had a key to the box and were authorized by C. D. Healy to enter and have access to the box; that the grantees named in the deed knew of its existence and of the delivery of the deed, and that Addie Ruth Reeder knew that the deed was in the safety-deposit box. "That at no time from the delivery of said deed to Eugene Foster in 1910 or 1911 until the death of said Clifton D. Healy did the said Clifton D. Healy have the said deed in his hands or possession, or demand the same, and that it was kept by said Eugene Foster from the time it was delivered to said Eugene Foster by Clifton D. Healy in 1910 or 1911 until after the death of Clifton D. Healy." The reply denied all of the allegations of the answer and of the amendment thereto respecting the delivery of the deed.

Defendants offered testimony relating to the delivery of the deed in 1910 and what was done with it, which may be summarized or quoted as follows: William Bowen, husband of one of the defendants, testified that one day in the spring of 1910 C. D. Healy was at his home in Butler county; that Gene Foster was there, and that a Mr. Putnam, who was in the real-estate business, called to see Mr. Healy about his land, "and at that time Mr. Healy told him that he had deeded this land to his oldest children. He said he had deeded this to his oldest children on account of their mother having

some money (perhaps meaning the mother of plaintiffs) and he didn't want to sell the land, he wanted to keep it in his possession so he could have access to it while he lived, and he had made a deed and was going to turn it over to Gene Foster."

Gene Foster, in direct examination, testifying to the same transaction, said Mr. Healy had recently come from Louisiana, where he had been living for two or three years.

"Q. Did you have any conversation with reference to a deed with him at that time? A. Yes, sir.

"Q. What was that conversation? A. He told us he had the deed drawed up to his children of his first wife.

"Q. . . . Did he show you any paper? A. I'm not sure that he did at that time."

Later Mr. Healy showed the deed to the witness in El Dorado at the El Dorado National Bank.

"Q. What did he do with it? A. He gave it to me.

"Q. What did he say about it when he gave it to you? A. He told me to take care of it.

. . . . . . . . . . . .

"Q. Have you related all of the conversation at that time between you and Mr. Healy? A. Well, practically so. . . .

"Q. Did you take the deed? A. Yes, sir.

"Q. How long did you keep it? A. It was in my box, practically—in fact, all of the time until he changed the box to the Citizens Bank.

. . . . . . . . . . . .

"Q. What was done with the deed then? A. It was put in his box.

"Q. By whom? A. Well, I'm not sure that—I think he took it himself. I gave it to him to put in there. . . .

"Q. Did he ever give you any reason as to why he made the deed? A. Yes; he made it out to the children where he wanted it to go, that he had made provision for the other children in a previous settlement."

The witness had transacted various business items for Mr. Healy during his lifetime.

"Q. Was there a period of time when you and he kept and had the same safety-deposit box in the El Dorado National Bank? A. Yes, sir.

"Q. Did you have a key and he have one? A. Yes, sir.

"Q. During that time either of you had access to the box as you went to it? A. We did.

"Q. And was this deed, exhibit 1, kept in that box to which both of you had a key? A. It was.

"Q. For this period of some thirteen or fourteen years? A. Yes, sir."

*Cross-examination:*

"Q. At the time you claim Mr. Healy delivered this deed to you and he said keep it, did he have a safety-deposit box in any bank in El Dorado? A. We had the box together.

"Q. And he had as much access to the box as you did? A. Well, you might say yes.

"Q. You each had a key? A. Yes.

"Q. A joint box? A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And he could go in and take anything out of that box he wanted? A. Sure.

"Q. When he gave you this instrument he said keep it? A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And he took this deed from the box that you both had access to and put it in his own box? A. I gave him the deed at the time he took the box over to the bank—the Citizens Bank.

"Q. And you returned the deed to Mr. Healy? A. I turned it over to him, yes.

"Q. Did he ask you for it? A. He did not.

"Q. You delivered it to him? A. I let him have it to put in the box."

Answering questions propounded by the court, the witness testified that Mr. Healy's third wife was with him when he was in Butler county in 1910 and that they stayed through most of the summer; that the deed had been executed a short time before they came, and at that time Mr. Healy did not have a box in the bank.

"Q. Did you have a box before that time? A. He and I had one together, yes. That's all."

Prior to that time Mr. Healy had had no papers in the box. They were in the El Dorado National Bank when Mr. Healy gave him the deed.

"Q. What did you do with it then? A. I took it and put it in my box.

"Q. Did he at that very time get an interest in this box you had? A. No.

"Q. He was getting in your box, or how did you do it? A. No, not for some time did he have a box, until he came back here, I think, to live, or practically so, after his wife died." (That was his third wife.)

"Q. You mean during that summer he was here he didn't get a box of his own or have a box with you? A. No, I don't think so.

"Q. You took the deed when he gave it to you and put it in what was then your exclusive box? A. Yes, sir."

It was sometime later that they had the joint box.

"Q. When did he get that deed from you, then? A. As I remember, he got the deed, or I gave him the deed at the time he put his papers in the Citizens Bank.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. What did he say to you at that time? A. Well, I had quite a good many papers in the box there and I asked him if he wanted to take the deed and some other papers he had in an envelope.

"Q. Did he still have some papers in your box? A. Yes. And he said it didn't matter, he could take it, and so he did.

"Q. Do you remember anything else he took at that time, other than the deed? A. No—well, what papers was in the envelope that was together with the deed. I never examined them.

"Q. You don't know what those were? A. I never examined them.

"Q. Did he have any money at that time in your box? A.. Not that I know of. If he did it was in the envelope and I never examined it.

"Q. Then he moved over to the Citizens Bank with his valuables and got him a box there, and you remained at the El Dorado National? A. Yes, sir. I was at Newton at that time.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    '.

"Q. Did you ever go and open up his box in the Citizens Bank? A. I never did. I never did have a key to the Citizens Bank, because I was at Newton at that time and I didn't have anything to do with it.

"Q. After his death were you here when they went to the box to look? A. I was.

"Q. Who had the key to his box? A. Mrs. Reeder.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. And this box was opened up at the Citizens Bank two or three days after his death? A. Yes, sir; after the funeral.

"Q. This deed was found in his box? A. Yes, sir.

"Q. And some currency? A. Yes.

"Q. Anything else? A. Well, there were some papers. Of course I don't know the contents of them.

"Q. After you surrendered the paper to him at the time he moved over to the Citizens Bank, did he ever after that say anything about the deed? A. Well, I don't know that he did in particular. . . .

"Q. At the time he first handed you the deed was his wife present? A. No.

"Q. Do you remember now just what was said about it at that time? A. He told me to take it and put it in the box and take care of it.

"Q. Did he ever talk to you at any time about recording the deed? A. Well, I think that there was something said about that, but I don't know as I can tell you in so many words, but he wanted charge of the place for his benefit as long as he lived and expected the children to have it as soon as— at his death.

"Q. When did you have a talk of that kind? A. Well, that's been from the time he delivered the deed, or from the time he was at Mr. Bowen's with it.

"Q. When he moved over to the Citizens Bank what was first said then? Who first asked about this deed? A. I asked him if he wanted to take the deed over there. If I remember I had not a very large box and it was pretty well crowded, and I asked him about it, if he wanted to take it.'

"Q. What did he say? A. He said he didn't know that it made any particular difference—that he would take it."

Mr. Godding, an employee of the El Dorado National Bank since 1917, testified that prior to 1927 the bank had some old safety-deposit boxes which it permitted its customers to use without charge, and very little record was kept except of the names; that on the old bank records C. D. Healy's name appeared after one of the box

numbers, but there was nothing to indicate that the box was ever used by him, and when the old boxes were taken out in 1927 this box had to be pried open and was found to be empty. In 1927 a new set of boxes was installed, and since then modern records have been kept. Mr. Healy never had one of the new boxes. One of the old boxes was in the name of C. E. (Gene) Foster. When the new boxes were installed in 1927 Mr. Foster rented one of them, and continued to have and use it up to the time of the trial of this action in June, 1938.

Mr. Corman, an officer of the Citizens State Bank of El Dorado, testified that C. W. Healy leased a safety-deposit box in that bank August 7, 1925, and continued to lease it as long as he lived. The card for that box showed C. L. (Lee) Foster and Addie Ruth Reeder had signed as persons authorized to open the box. These entries were not dated, but the different ink used would indicate they were not made when the box was first leased.

Lee Foster testified that one day in the late summer or fall of 1927 or 1928 his grandfather, C. D. Healy, went with him to the Citizens State Bank and had him sign the card for the box, and later he was given a key to the box, which he carried for a while and lost. There is no evidence in the record that Lee Foster ever went to this box and opened it alone. He was present with others when the box was opened after the death of C. D. Healy. In his opening statement counsel for defendants gave this reason for C. D. Healy to have Lee Foster have access to his box: Mr. Healy frequently was away at tax-paying time. He kept currency in this box and paid his taxes in cash, and he would write Lee Foster to go to his box, get enough currency, and pay his taxes, and perhaps would have Lee go to the box for other specific things.

The record is silent as to when and under what circumstances the name of Addie Ruth Reeder was written on the card. She lived in Kansas City, Kan., and testified she was not acquainted with the banks in El Dorado. There is nothing in the record to show she was ever in the bank until after her father's death, or that she ever had a key to the box until two days before his death, when her father gave it to her and told her what it was.

Other details of the evidence need not be set out, further than to say that Mr. Healy, after the death of his third wife, in the last few years of his life spent much of his time visiting with his children. He corresponded and visited with plaintiffs as well as with defend-

ants. It appears that he never told any of the plaintiffs about this deed, but perhaps had told some of the defendants that he had made it. He died at the home of his daughter, Mrs. Reeder, in Kansas City after but two days of serious illness. He was buried in Butler county. All of the children were notified and attended the funeral. Soon thereafter Mrs. Reeder and some of the other defendants went to the Citizens State Bank in El Dorado and Mrs. Reeder opened his safety-deposit box with the key he had handed to her. They expected to find his will in the box, but no will was found. They did find in the box the deed in question here, some other papers not here important, and about $4,000 in currency. Defendants had the deed recorded, and on Mrs. Reeder's petition, Mrs. Bowen was appointed administratrix of the estate of her father and gave notice of her appointment. Later plaintiffs first learned of the things which took place after the funeral.

The court took the case under advisement, briefs were furnished, and on July 26, 1938, the court made its findings as follows:

"At the times of the arguments in this case, I pointed out the difficulties presented by the evidence, and explained that in my opinion there was much evidence consistent with a delivery of the deed prior to death and much evidence that would indicate the contrary. I believe that it will be agreed by all parties that there is no one bit of evidence that can be said to be conclusive on the matter of delivery, or of nondelivery.

"The evidence presents a situation in which the court, and no other person, could, in my judgment, feel that its decision was free from considerable uncertainty. Of course, the main question is, Did Clifton D. Healy intend to deliver this deed? In any case there must be some evidence going beyond a mere intention to deliver. Again, if this was an ordinary sale of this land for value, we would probably draw certain conclusions from the evidence that might not be justified in the case of a gift from a parent to some of his children. I need not review the evidence further than to say that the divorce decree indicated that Clifton D. Healy made a substantial equal division of his property with his second wife at the time of the divorce. His divorced wife was given the custody of the three children born to her. I presume that Mr. Healy took the custody of the six children born to him of his first wife. This left it possible for the three children to inherit from their mother property that I assume was of about one-half of his worth. It also left it possible for the nine children to inherit from their father. I feel that Mr. Healy did not feel that the three children should be so favored above the other six. The deed that he drew in 1910 bears out this idea, though I believe that one of the six had then died, leaving no wife or children. In 1910 he drew this deed when he was in the South and when, I take it, that no child knew that he was planning on making a deed. He brought it to Kansas and soon thereafter handed the deed to Mr. Foster. There may be some question whether

Mr. Foster had the exclusive possession or whether the possession was joint with the grantor, but it seems it remained in the possession of Foster for about 18 years, when he delivered it to the grantor and it remained in his box until his death in July, 1929. In other words, the grantor caused this deed to be prepared without notice to any of the children he named as grantees, his five living children by his first marriage; he gave the deed to Mr. Foster and for 19 years the grantor saw to it that the deed was preserved and it was found in his box after his death. If he had not intended that the deed should be effective, he had the opportunity to destroy it, but having kept it for 19 years, I am convinced that he kept it for a purpose. Of course, if he had merely executed the deed and placed it in his bank box, that alone would not constitute delivery. But I believe that when the grantor handed the deed to Mr. Foster and in substance told him to keep it until after his death, that constituted delivery as of that date, which I believe was in the spring of 1910. That will be the judgment."

It seems obvious that the controlling thing in the court's findings was the view that the result would make a more equitable division among all the children of C. D. Healy of the half section of land originally owned by him. This was not an issue in the case and should not have had any influence in the findings of the court. When C. D. Healy and his second wife were divorced the title to the real property set off to the wife was vested in her, not in her children. What she did with that land, how much of it was consumed in the maintenance and education of the minor children placed in her custody, how much of it was necessary for her own maintenance, whether she still owns it, whether she is still living, and if so, the state of her health, and how much of it may yet be needed by her, cannot be determined by a study of this record. No issue of that kind was framed by the pleadings, and there was no evidence on that issue, unless it is a few fragmentary statements of some of the witnesses which might have had some bearing on the issue, if it were being tried, but which, standing alone, or collectively, are wholly insufficient on which to base a judgment.

The sole controverted issue framed by the pleadings was whether the deed in question had been effectively delivered within the lifetime of the grantor, C. D. Healy. Defendants in their answer pleaded such a delivery and relied upon that point to defeat the claim of plaintiffs to a share of the property in controversy which otherwise the facts pleaded would have entitled them to receive.

Now, on this point the rules of law in this state, and generally elsewhere, are quite well settled. Perhaps as clear a statement of them as is found in any of the opinions is the language of Mr. Justice Mason in *Young v. McWilliams*, 75 Kan. 243, 245, 89 Pac. 12:

"Where one who has executed a deed retains it in his own possession, with the intention that it shall become operative upon his death, no conveyance is effected. He dies in the full ownership of the property and the title passes to his heirs or devisees. (Citations.) But where he deposits it with a third person, to be turned over upon his death to the grantee, this is a good delivery if he thereby surrenders all control over it, but not otherwise. (Citations.) In such a case the title is deemed to vest at once in the grantee, only the enjoyment of the property being postponed, a condition which the grantor is competent to create and which arises whenever a purpose on his part to establish it is sufficiently manifested, whether by express instructions to the depositary or otherwise. The important inquiry here, therefore, is whether J. R. Young gave the deed to Bowlus, the custodian, intending thereby to part with the title of the property. If he retained control of the deed the situation was substantially the same as though he had held it in his own possession."

Consistently this doctrine has run through our decisions, as this list of cases, not intended to be complete, shows: *Burton and Shoemaker v. Boyd,* 7 Kan. 17; *Stone v. French,* 37 Kan. 145, 14 Pac. 530; *Wuester v. Folin,* 60 Kan. 334, 56 Pac. 490; *Nolan v. Otney,* 75 Kan. 311, 89 Pac. 690; *Harmon v. Bowers,* 78 Kan. 135, 96 Pac. 51; *Norton v. Collins,* 81 Kan. 33, 105 Pac. 26; *Worth v. Butler,* 83 Kan. 513, 112 Pac. 111; *Zeitlow v. Zeitlow,* 84 Kan. 713, 115 Pac. 573; *Ross v. Perkins,* 93 Kan. 579, 144 Pac. 1004; *Rust v. Rutherford,* 95 Kan. 152, 147 Pac. 805; *Gideon v. Gideon,* 99 Kan. 332, 161 Pac. 595; *Shell v. Mulligan,* 103 Kan. 185, 173 Pac. 286; *Mahoney v. Mahoney,* 112 Kan. 377, 210 Pac. 1098; *Hoard v. Jones,* 119 Kan. 138, 156, 159, 237 Pac. 888; *Johnson v. Cooper,* 123 Kan. 487, 255 Pac. 1112; *Burch v. Burget,* 130 Kan. 243, 285 Pac. 574; *Sample v. Reed,* 130 Kan. 524, 287 Pac. 614; *Smith v. Roscoe,* 130 Kan. 595, 287 Pac. 596; *Tracy v. Thatcher,* 135 Kan. 615, 618, 11 P. 2d 691; *John Hancock Mut. Life Ins. Co. v. Chinn,* 138 Kan. 804, 28 P. 2d 761; *Poteet v. Knappenberger,* 139 Kan. 534, 31 P. 2d 1003; *Mundell v. Franse,* 143 Kan. 139, 46 P. 2d 16; *Roberts v. McCoach,* 145 Kan. 407, 65 P. 2d 289; *Fulton v. Menefee,* 146 Kan. 150, 68 P. 2d 1112.

For other authorities in harmony with our decisions, see 18 C. J. 203; 16 Am. Jur. 516-521, and the cases cited in the annotation in 52 A. L. R. 1227 and the subsequent Blue Book citations.

Under these authorities when the owner of real property executes a deed for it and places it in the hands of some third person to be delivered to the grantee after the death of the grantor, in order to make such delivery effective the grantor must have parted with the possession of and all the dominion and control over the deed. When

Mr. Healy gave this deed to Gene Foster he told Foster "to keep it." Nothing was said about how long Foster should keep it, or what eventually he should do with it. In both his direct and cross-examination Foster testified that all of the time the deed was at the El Dorado National Bank it was kept in a safety-deposit box jointly used by him and Healy. In answer to some of the questions propounded to him by the court he seems to have stated that the deed was in his "exclusive" safety-deposit box for some indefinite time after it first was handed to him, but later and for some number of years, which he could not fix, it was kept in a box jointly used by him and the grantor, and it is clear that for about five years prior to the death of the grantor he had the deed in his own safety-deposit box in the Citizens State Bank, a box to which Gene Foster never had a key nor any access. Hence, it cannot be said that the grantor parted with dominion and control over this deed. The trial court's finding recognized that fact. The result is the evidence does not sustain a finding that the deed was effectively delivered to Gene Foster at any time.

In the answer it was pleaded that the grantor had delivered the deed to his daughter, Addie Ruth Reeder, several months before his death. Evidence to support that allegation was wholly lacking. In the trial there was a suggestion by counsel for defendants that the court might find the deed to have been effectively delivered by the grantor to Mrs. Reeder, two days before his death, at the time he handed her the key to his box in the Citizens Bank and told her what it was. The trial court was unable to find an effective delivery of the deed from the evidence pertaining to that transaction, and in that we agree with the trial court.

Touching the suggestion of counsel for defendants in his letter to the clerk of this court to the effect that he regarded the decision of the trial court to be one based upon controverted facts, the rule respecting that is stated in *Hoard v. Jones,* 119 Kan. 138, 158, 237 Pac. 888, as follows:

"Ordinarily the question of the delivery of a deed is one of fact to be determined by the jury or trial court from all the evidence pertaining to that matter (citations); but where the facts are not controverted it is a question of law to be determined by the court. (Citation.)"

More than that, any time an appellant presents to this court the question whether there is substantial competent evidence to sustain the finding of the trial court in any case, it is the duty and function

of this court to examine the record to see if there is any such evidence to sustain the finding, and in doing so it is passing on a question of law. The rule is well stated in *Gallagher v. Menges & Mange Const. Co.*, 146 Kan. 506, 72 P. 2d 79, where it was held:

"While this court does not weigh evidence or determine the credibility of witnesses, the question of whether there is substantial evidence to support findings of fact is reviewable, as it presents a question of law as distinguished from a question of fact." (Syl. ¶ 2.)

Since defendants at the trial were contending the deed had been effectively delivered to Gene Foster in 1910, and it was shown that Foster's wife, one of the grantees in the deed, died intestate in 1919, plaintiffs objected to Foster testifying to transactions he had personally with C. D. Healy and pertaining to this deed, on the ground that he was a disqualified witness under our statute. (G. S. 1935, 60-2804.) This objection was overruled, and appellants complain of that ruling. In view of the fact that we have determined that the evidence fails to show an effective delivery, even when Foster's testimony is considered, we find it unnecessary to pass upon the correctness of the trial court's ruling as to the admission of his testimony. We prefer to do that when the question has been more thoroughly briefed.

The judgment of the trial court is reversed, with directions to set aside the judgment heretofore rendered, insofar as it affects the two 80-acre tracts of land in question, and to enter a judgment that each of the plaintiffs is the owner of an undivided one-eighth interest in the two 80-acre tracts and to render judgment of partition accordingly.