Nos. 41,907 and 41,934

Guy C. Reed, *Appellee*, v. Elsie G. Keatley, *Appellant*.

(356 P. 2d 1004)

Opinion filed November 12, 1960.

*William B. McElhenny*, of Topeka, argued the cause, and *M. F. Cosgrove, Robert E. Russell, Willard N. Van Slyck, Jr., O. R. Stites, Jr.*, and *James L. Grimes, Jr.*, of Topeka, and *Tom Harkness*, of Ness City, were with him on the briefs for the appellant.

*Jack E. Dalton*, of Jetmore, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

FATZER, J.: This was an action to quiet title to 155 acres in the Southwest Quarter of Section 15, Township 18 South, Range 22, Ness County, Kansas. The plaintiff, Guy C. Reed, alleged he was the owner in fee simple and in possession of the entire quarter section. The defendant, Elsie G. Keatley, answered and cross-petitioned, alleging ownership in an undivided one-half interest (less a certain five-acre tract) by virtue of the law of intestate succession, and prayed for partition. In his reply the plaintiff asserted title to the property as grantee in a deed dated May 10, 1946, from A. H. Reed, the father of both parties. Trial was by the court which found in favor of the plaintiff and rendered judgment quieting his title. Following the overruling of the defendant's motions to set aside findings of fact and conclusions of law and for a new trial, the defendant appealed.

On May 10, 1946, A. H. Reed, Martha Reed, his wife, and Guy C. Reed went to the office of P. W. Lundy, Secretary-Treasurer of the National Farm Loan Association in Ness City, to discuss the division of Reed's land. During the conversation it developed that Reed was going to give Guy five acres of land in the quarter section on which to build some improvements. The question was raised whether Guy should make a substantial investment on five acres of land in the country, and Lundy suggested to Guy that if he were going to build a home he should build it in town where it would have a better resale value. Guy indicated he would not build in the country unless he had title to the five-acre tract and also be assured that he was going to get more than five acres. At that time Reed spoke up and stated that Guy was to get the remaining 155 acres "when he was through with it." In accordance with that understanding and at Reed's direction, Lundy prepared two deeds in which Guy was grantee, one for the five-acre tract, and the other for the balance of the quarter section, or 155 acres of land. Both deeds were signed and acknowledge by Reed and Martha, and Lundy laid them on the table, pointing out the deed for the five-acre tract, and the one for the 155 acres. Reed handed Guy the deed to the five-acre tract, and took the other deed and stated "he was going to take it to the bank and put it in the bank so it would be there for Guy when he was through with it and gone."

Within a few days after the deeds were executed, Guy commenced the building of improvements on the five-acre tract and

built a barn and put down a stock well on the remaining 155 acres, expending some $7,500.

During the lifetime of Reed, Guy occupied the quarter section as his home but Reed paid the taxes, received oil lease rentals, and leased the premises to Guy.

The defendant and her husband were indebted to Reed in the sum of $4,000 for which one or both had executed a promissory note to him. Sometime after May 10, 1946, Reed put the deed to the 155 acres in an envelope and the defendant's note in another and placed both in escrow in a bank in Ness City. Thereafter, Reed told numerous witnesses that he had executed the deed and placed it in the bank to be delivered to Guy when he was gone; that "The note was to go to Elsie," and "the deed was to be given to Guy when he died," that "after I'm gone there'll be no trouble, Guy's will be handed to him and Elsie's will be handed to her, and there'll be no settling up any estate," and that "he had things fixed up. A deed to Guy for the Ringe Place and the note to Elsie." Further, "When I'm dead and gone there won't be any trouble to settle my estate, because I have a deed for Guy for the Ringe Place and this note of·four thousand dollars that Elsie owes in the place, and they're in escrow in the bank to be divided when I'm gone." One of Reed's granddaughters testified to a conversation she had with her grandfather and he said, "that he had the deed in the bank but he could take it out any time he wanted to and nobody could touch it, not even Martha, just him." O. J. Weir, president of the bank at the time Reed deposited the deed and note in the bank, was not present to testify and there was no direct evidence as to what instructions Reed gave the bank at that time. Roy Krug, president of the bank, testified that at the time Reed left the envelopes the bank apparently did not keep any record to show when such items were deposited or who brought them in, but the "escrow book" the bank presently kept had the following entry: "Six-X, Reed, A. H. Par. P., Fee Paid, sealed envelopes, taken out by A. H. Reed, 6-11-55," and that he personally delivered the envelopes to Reed. The defendant's husband testified that Reed brought the envelopes to the defendant's home and stated one contained the deed and the other the promissory note and he wanted Elsie to destroy them, but she refused to do so. Reed threw the envelope in a trash can and later asked the defendant's husband to burn them, which he did.

The district court prepared a written memorandum, the pertinent portions of which read:

"Mr Reed and Guy came to Mr. Lundy's office for the purpose of having him prepare a deed for five acres of the quarter in question. Guy was to erect improvements on these five acres. Mr. Lundy suggested that if Guy only got five acres, the improvements, since they would be in the country, would not be as desirable and have as much sale value as the same improvements placed on a tract in town. Mr. Reed, then stated he wanted Guy to have the rest of the quarter after he was dead. Mr. Lundy suggested the making of a deed to be left at the bank. Why a deed? And, why leave it at the bank? All parties must have agreed that this would protect Mr. Reed's income for life from the real estate, and Guy's title to the rest of the quarter when he placed the improvements on the five acres. In order to protect Guy in the building of the improvements, title would have to pass to the deed when it was left at the bank.

"In accordance with the agreement made that day, Mr. Reed placed the deed in the bank with instructions to deliver the deed to Guy at his death, and Guy placed the improvements on the five acres.

"After the deed was left at the bank, Mr. Reed told witnesses in substance his estate was all settled. He had left the deed and Elsie's note at the bank and it would deliver the deed to Guy and the note to Elsie after he was gone. In order to settle everything before his death he must have given Guy title to the deed and Elsie title to the note when he left them at the bank.

"Mr. Reed, years later, secured the deed and note from the bank. He settled his estate when he left the deed and note at the bank, and this was a futile attempt on his part to unsettle his already settled estate, or, title to the deed having already passed to Guy, Mr. Reed could not by taking the deed from the bank thereby destroy Guy's title. This would be contrary to the promise made to Guy that day in Mr. Lundy's office.

"Later, the deed and note were destroyed by Elsie's husband. The court is unable to determine from the evidence whether the destruction was with or without Mr. Reed's consent and direction. The law of evidence raises a strong presumption against one destroying such papers; this is especially true when the instrument is a deed to the real estate in question."

The sole question presented is succinctly stated in the appellant's brief as follows:

"The only question involved is whether or not there was substantial competent evidence before the trial court to support its finding and conclusion that the deed in question was effectively delivered within the lifetime of the grantor, A. H. Reed."

It is well settled in this jurisdiction that before a deed can operate as a valid transfer of title there must be a delivery of the instrument which becomes effective during the life of the grantor. (*Wuester v. Folin*, 60 Kan. 334, 56 P. 490; *In re Estate of Hulteen*, 170 Kan. 515, 227 P. 2d 112.) What constitutes sufficient delivery is largely a matter of intention, which is a question of fact unless the evidence

is uncontroverted. The whole matter of delivery is one of intent on the part of the grantor, and if the grantor, by words or acts, manifests an intention to divest himself of title and vest it in another, it is sufficient to constitute a valid delivery. (*Smith v. Dolman,* 120 Kan. 283, 243 P. 323; *Johnson v. Cooper,* 123 Kan. 487, 255 P. 1112; *Roberts v. McCoach,* 145 Kan. 407, 65 P. 2d 289; *Stump v. Smarsh,* 153 Kan. 804, 113 P. 2d 1058; *Burgin v. Newman,* 160 Kan. 592, 164 P. 2d 119.)   See, also, *Balin v. Osoba,* 76 Kan. 234, 91 P. 57; *Doty v. Baker,* 78 Kan. 636, 97 P. 964; *Zeitlow v. Zeitlow,* 84 Kan. 713, 115 P. 573, and *McLain v. Barr,* 125 Kan. 286, 289, 264 P. 75.   It is not necessary that the divestment of title or the delivery of the deed be made directly to the grantee.   The grantor may effectively divest himself of title if he deposits the deed with a third person to receive and hold the same for delivery to the grantee after the death of the grantor, with a declared or manifest intention to place it beyond the custody and control of the grantor and thereby to give it effect as a present conveyance. (*Zeitlow v. Zeitlow,* supra; *Harmon v. Bowers,* 78 Kan. 135, 96 P. 51, 17 L. R..A. [NS] 502; *Nolan v. Otney,* 75 Kan. 311, 89 P. 690, 9 L. R. A. [NS] 317; *Hush v. Reeder,* 150 Kan. 567, 95 P. 2d 313; *Estate of Hulteen,* supra; *Hicklin v. DeVore,* 179 Kan. 345, 295 P. 2d 668.)   In *Wuester v. Folin,* supra, the usual test was said to be:

"Did the grantor by his acts or words, or both, manifest an intention to make the instrument his deed, and thereby divest himself of title?   When the deed has passed beyond the control of the grantor, and he has placed it in the hands of a third person with a declared or manifest purpose to make a present transfer of the title, a formal acceptance by the grantee is not required." (l. c. 337.)

Once there is a valid delivery, either to a grantee or to a third party, with an intention to effect a present conveyance, it makes no difference if the grantor reacquires the deed because title vested at the time of the delivery and the grantor is powerless to defeat this vesting of the title (*Zeitlow v. Zeitlow,* supra: *Stump v. Smarsh,* supra; *Hutton v. Hutton,* 184 Kan. 560, 337 P. 2d 635; *Cole, Administrator v. Hoefflin,* 187 Kan. 66, 354 P. 2d 362).   In the Cole case, *supra,* it was said:

"It is true that in 1951 the mother requested that Laverna get the deeds for her, mentioning that she intended to sell her Kansas properties.   Laverna did as requested and gave her the Kansas deeds.   From then until her death the mother was in possession of them.   But, even though they came into her

possession, such fact would not—and did not—defeat the delivery previously made in 1947. . . ." (l. c. 70.)

In *Stump v. Smarsh,* supra, it was said:

". . . Where a deed is effectively delivered, the fact that it is handed back to the grantor for some purpose dos not defeat the delivery. . ." (l. c. 809, 810.)

The appellant contends that the absence of direct evidence that Reed gave instructions to the bank and his withdrawal of the deed without procuring Guy's consent indicate he had the right to withdraw it, which right could only be reserved by him at the time he deposited the deed, hence, he did not surrender all control over the deed when he delivered it to the bank. The contention is the crux of this lawsuit and reaches to the very heart of the case, whether an effective delivery of the deed was made so as to effect a valid transfer of title during the lifetime of the grantor, and points directly to the sufficiency of all the evidence to support the findings of the district court that such a delivery occurred.

As previously indicated, delivery is largely a matter of intention, and ordinarily the question is one of fact to be determined by the jury or the trial court from all the evidence, but where the facts are not controverted, it is a question of law to be determined by the court. (*Hoard v. Jones,* 119 Kan. 138, 237 P. 888.) The fact that Reed continued to pay taxes, collect oil lease rentals and lease the property during his lifetime is not inconsistent, but supports the district court's finding that he intended to divest himself of title and presently vest it in Guy, reserving to himself a life estate in the quarter section. All the circumstances tend to show an intention on Reed's part that there should be an immediate vesting of title in Guy, the enjoyment alone being postponed until his death. The defendant and her husband were aware of the grantor's intention and the purpose for which the deed was deposited in the bank. In fact, the appellant herself acknowledged that the land was Guy's, and "she was afraid that after her father was gone he (Guy) would sell it to the neighbors and she wanted the land."

All that is lacking fully to establish delivery is a showing of instructions given the banker when Reed deposited the deed and note in the bank at Ness City. The then president of the bank was not present to testify nor was his deposition taken, but this may be supplied by presumption or inference from the attendant circumstances. (*Young v. McWilliams,* 75 Kan. 243, 252, 89 P.

12.) Indeed, the repeated express declarations of the grantor himself that the deed and note were in the bank to be delivered to Guy and Elsie when he was gone; that there would be no settling of his estate because he had things fixed up—the bank would hand Guy his deed to the quarter section and Elsie her $4,000 note, compel the conclusion that when Reed deposited the deed and note in the bank he intended at that time to divest himself of title to the quarter section and vest it in Guy, reserving to himself a life estate in the property. All the known facts are consistent with the theory of an effective delivery. Moreover, his reacquistion and destruction of the deed did not defeat the valid constructive delivery of it to Guy nor impair his title to the quarter section. (*Stump v. Smarsh,* supra; *Cole, Administrator v. Hofflin,* supra.)

While there was no direct evidence that Guy proceeded to improve the quarter section in reliance upon the deed to the 155 acres, there was ample evidence to support the district court's finding that he did. Whenever it appears that the contract or arrangement between the parties has been so far executed or completed that they must have understood that the grantor divested himself of title and that the grantee was invested with it, delivery will be considered complete although the instrument itself remains in the hands of the grantor (*Zeitlow v. Zeitlow,* supra).

Considering all the circumstances, we think the district court was fully justified in finding there was an effective delivery of the deed in question, and that when Reed left the deed at the bank he intended to transfer title to the quarter section to Guy, reserving to himself a life estate. This conclusion compels an affirmance of the judgment of the district court.

It is so ordered.

Schroeder, J., (dissenting): This case illustrates what happens when incompetent advice is given and the practice of law is undertaken by a layman, the secretary-treasurer of the National Farm Loan Association of Ness City.

In my opinion, the plaintiff (appellee) has not sustained the burden of proof cast upon him in this case to show a valid delivery of the deed in question.

The rule to which this court has adhered in many cases was stated in *Young v. McWilliams,* 75 Kan. 243, 89 Pac. 12, as follows:

". . . Where one who has executed a deed retains it in his own possession, with the intention that it shall become operative upon his death, no con-

veyance is effected. He dies in the full ownership of the property and the title passes to his heirs or devisees. . . . But where he deposits it with a third person, to be turned over upon his death to the grantee, this is a good delivery *if he thereby surrenders all control over it, but not otherwise.* . . . In such a case the title is deemed to vest at once in the grantee, only the enjoyment of the property being postponed, a condition which the grantor is competent to create and which arises whenever a purpose on his part to establish it is sufficiently manifested, whether by express instructions to the depositary or otherwise.

"The important inquiry here, therefore, is whether J. R. Young gave the deed to Bowlus, the custodian, intending thereby to part with the title to the property. If he retained control of the deed the situation was substantially the same as though he had held it in his own possession . . ." (pp. 245, 246.) (Emphasis added.)

This case has been cited and quoted with approval in *Hush v. Reeder*, 150 Kan. 567, 95 P. 2d 213, where many decisions are accumulated; and in *In re Estate of Hulteen*, 170 Kan. 515, 227 P. 2d 112. (See, also, *Hutton v. Hutton*, 184 Kan. 560, 337 P. 2d 635.)

The evidence in the instant case is uncontroverted that the decedent, A. H. Reed, was able to and did withdraw the deed in question from the bank without procuring the consent of the grantee therein, and this was done with the full knowledge and consent of the president of the bank, Roy Krug. The decedent therefore felt he had the right to withdraw the instrument, which right could only have been reserved by him at the time he deposited the deed. There is no evidence whatever disclosed by the record to show that there were any instructions given to the bank when the deed was originally left there by the decedent. Absent such evidence, the only assumption which can be made is that the grantor was doing what he had reserved the right to do when he withdrew the deed. In other words, he retained dominion and control over the deed which had been placed in the bank.

This is confirmed by the testimony of Fern Michel, the granddaughter of the decedent, who quoted the decedent as saying "that he had the deed in the bank but he could take it out any time he wanted to and nobody could touch it, not even Martha, just him."

Bear in mind that it is the plaintiff who must sustain the burden to prove delivery. The plaintiff did not call as a witness the person who was president of the bank at the time the decedent delivered the deed in question to the bank, although Mr. Weir's address was given by Roy Krug, who succeeded Mr. Weir as president, as Punta Gordo, Florida, nor did the plaintiff offer the deposition testimony of Mr. Weir on this point which is vitally important to his case.

On this crucial point of delivery just what was the testimony of Roy Krug with respect to the bank records? It is vital to quote all the pertinent testimony in the record on this point. It follows:

"Q. Do you have with you today a book which I believe you denominate as 'Escrow Book'?

"A. I do.

"Q. You have that record with you, is that correct?

"A. I do have.

"Q. Would you describe or tell what this escrow book is—what it is used for?

"A. The book you referred to as 'Escrow Book', as it is commonly called, has loose leaf pages in it on which we describe any items placed in the bank in escrow. It also has other loose leaf pages describing items that were left with us for safe keeping or left in our care, and it contains our records as far as any escrow or safekeeping items are concerned.

"Q. Now, what does the escrow book show? Does it show who placed the instruments there and various data in that connection?

"A. No, I don't believe it is that complete.

. . . . . . . . . . . . . .

"The Court: Does the book show who placed the items there?

"A. Are you speaking of entries in the book?

"The Court: No, no. Somebody brings a paper in and gives it to you either for an escrow or gives it to you for safe keeping, do you make an entry as to who brought the particular paper in?

"A. No.

"The Court: If I take a deed over to you and give it to you and say I want you to place this in a safe keeping you don't make any entry in the book that I brought the deed over?

"A. If the Court please, our escrow items show the parties concerned directly connected with the escrow and in the largest part of the percentage of cases the parties concerned with the escrow bring in the papers.

"The Court: That isn't exactly what I asked you, Mr. Krug. Whether or not the book shows who brought the papers in?

"A. No. This book, you understand, contains other entries besides descriptions of escrow and the completeness of them is not the same in all cases.

"Q. Now, does the book always indicate exactly what was left or is it pretty general in that respect, too?

"A. The book in the case of an escrow we make up an individual page for each escrow at the time it is brought in and placed in our files listing—

"Q. Just a minute! As I understand this book then, primarily it's, am I correct is stating, that the book is primarily a guide to tell you where the transaction in located within the bank vaults, is that one of its purposes?

"A. That is one of the purposes of the record book.

"Q. Now, this is the book that the bank uses in its ordinary, normal course of business, is that correct?

"A. Yes.

"Q. Now, is there an entry in that book indicating any transaction with A. H. Reed?

"A. There is.

"Q. And, you have that with you?

"A. I do.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"The Court: Let him read it. Let the witness read the entry.

"Q. Would you read the entry, please, Mr. Krug, complete with number and symbol?

"A. Yes, sir. 'Six-X, Reed, A. H. Par. P., Fee Paid, sealed envelopes, taken out by A. H. Reed, six eleven, fifty-five.'

"Q. Now do you recall June 11—Pardon me? Offer in evidence, your Honor?

"The Court: It may be admitted in evidence, but, we don't have any entry at all at the time the papers were left there.

"Q. You have never been able to determine when the papers were left there, Mr. Krug?

"A. This is the only record I have been able to locate concerning this transaction.

"The Court: Don't you keep a file of some kind that shows when somebody brings some papers to leave with you as to when they were brought in and who brought them in?

"A. Apparently, we didn't at that time, Judge.

"The Court: All right.

"Q. Do you recall on June 11, 1955, when these envelopes were removed?

"A. The records that I have show that they were removed on June 11, 1955."

On cross examination by the defendant Mr. Krug testified:

"Q. Mr. Krug, did you release any escrowed articles to A. H. Reed?

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. No.

"Q. Mr. Krug, did you, in fact, return the two envelopes to A. H. Reed?

"A. Personally, do you mean—did I hand them to A. H. Reed?

"Q. Did you see him receive them?

"A. Without question, I delivered whatever was there to A. H. Reed."

The foregoing should be noted as the testimony of the *plaintiff's witness*. In substance he testified that while the bank did not in its escrow book show the name of the person who delivered an instrument to be placed in escrow, it did "show the parties concerned directly connected with the escrow." It is significant that this "escrow book" contained no entry indicating the deed in question had been placed with the bank in escrow. It is also significant that the escrow book contained entries of other documents which were not placed in escrow with the bank but were placed there for safe keeping. The entry relating to the withdrawal of the deed in ques-

tion was made in this book. Therefore, *this testimony and these records show that the deed in question was not placed with the bank in escrow.*

The appellee argues the testimony of Roy Krug that he did not release any escrowed articles to the decedent, A. H. Reed, was a mere conclusion of the witness. This may be conceded but the facts concerning which he did testify do show that the deed was not placed in the bank in escrow, and that his conclusion was correct. Yet the appellee relies on a statement made by the decedent during his lifetime, quoted by one witness, that he had the deed in the bank in escrow. In this situation, however, the appellee fails to assert that these statements are mere conclusions to be supported by more definite evidence. The statement made to the decedent's granddaughter that he retained the right to withdraw the deed in question from the bank would indicate the decedent, assuming he made the statement attributed to him concerning placement of the deed in escrow with the bank, did not know the legal significance of the term "escrow." On the other hand, it would be proper to assume that the president of a bank, which serves as escrow agent for patrons when requested, would be familiar with the legal import of an escrow agreement.

The appellee argues that when the circumstances surrounding the deposit of the deed with a third party are in doubt, then it is the intention of the grantor that is the determining factor, citing *Young v. McWilliams,* supra. *What did the decedent, A. H. Reed, do* after the deed in question was left at the bank? The undisputed evidence discloses that *he leased the land described in the deed* to his son, Guy, the appellee herein. Does one who owns land evidence an intention to part with the title to such property when he leases it to a grantee named in the deed under the circumstances here presented? Certainly not! By executing a lease the decedent exercised one of the incidents of ownership of the land in question and the appellee (lessee) so recognized it.

Nowhere in the record is there any indication that the decedent herein reserved a life estate in the 155 acres of land described in the deed in question. The scrivener of the deed, P. W. Lundy, who was called by the plaintiff (appellee) to testify in the case was not asked what the measure of the estate was that the decedent purported to convey by the deed—whether a life estate was reserved to the grantor, purporting to convey a future interest to the grantee, or whether the deed purported to be a conveyance of the fee title

to the grantee. The burden was upon the appellee to establish these facts.

If the grantor had reserved in himself a life estate, it would indicate an intention to make a present conveyance at the time the deed was left with the bank. Otherwise there would be no point in making the reservation. (*Young v. McWilliams,* supra, and cases cited and discussed therein; and *Bradbury v. Wise,* 167 Kan. 737, 208 P. 2d 209.)

Nowhere in the record is there any evidence that the decedent, at the time he executed the deed in question at the office of Mr. Lundy in the presence of the appellee, or at any other time, made any agreement to the effect that he reserved the rents, or use of the land, or that he exacted a promise from the children seeking to guard against future trouble, as was established by the evidence in the case of *Zeitlow v. Zeitlow,* 84 Kan. 713, 115 Pac. 573.

In the case of *In re Estate of Hulteen,* supra, *the court was permitted to say* the decedent's control of the property and his collection of the rents and profits therefrom, subsequent to the execution of the deed, was not inconsistent with the passing of title at the time he delivered the deed to a third party. The court there recognized, as to that phase of the matter, the test was not whether the grantor had retained possession or control of the property, but rather, whether he had retained possession or control of the deed. There, however, *the basic fact* that the grantor had retained no possession or control of the deed had been established—the very fact which the appellee in the instant case was obligated in the trial court to prove *by competent evidence.* The undisputed evidence in this case that the decedent paid the taxes, received oil lease rentals, and leased the premises to Guy, the appellee, does not establish whether the decedent has retained possession or control of the deed. It is therefore *improper* to say in this case the decedent's continued payment of taxes, collection of oil lease rentals, and leasing of the property during his lifetime supports the district court's finding that the decedent intended to divest himself of title presently and vest it in Guy, reserving to himself a life estate in the 155 acres of land in question.

Now what evidence remains to fulfill the appellee's burden to prove that the decedent intended to make a present delivery of the deed, in the legal sense, at the time it was left with the bank, or indicate that the decedent intended to part with title at the time the deed was left with the bank? Various witnesses called by the ap-

pellee quoted the decedent as saying that he had executed the deed in question and *placed it in the bank to be delivered to Guy when he was gone.* The appellee in his brief on this point summarizes as follows:

". . . It is clear from the evidence in this case that after executing and acknowledging the deed in question, A. H. Reed declared that his intention was to deposit the deed with the bank for delivery to Guy upon his death and that subsequent to the deposit of the deed with the bank, he declared on many occasions that the deed had been deposited in the bank for delivery to Guy Reed upon his death . . ."

From this evidence the appellee argues what greater manifestation of the grantor's intent can there be.

In my opinion, this argument has no merit. To fully appreciate the burden of proof cast upon the appellee one must again resort to the rule stated in *Young v. McWilliams,* supra, as heretofore quoted. The significant portion of the rule states that where the grantor in a deed deposits it with a third person, to be turned over upon the grantor's death to the grantee, it is a good delivery *if the grantor thereby surrenders all control over the deed, but not otherwise.* Obviously, this means when the grantor deposits the deed with a third person, to be turned over upon the grantor's death to the grantee, that such fact is *capable of two interpretations* as to when the grantor intended to part with the title to the property, the proper interpretation depending upon whether or not the grantor surrendered all control over the deed at the time he delivered it to the third person. (*In re Estate of Smith,* 162 Kan. 215, 174 P. 2d 1012.) This conditional fact or basic fact must first be established to ascertain the intention of the grantor in the matter.

It is clear the appellee cannot lift himself by the boot straps, so to speak, to establish the basic fact. In other words, the mere fact that the decedent herein delivered the deed in question to the bank, for delivery to the appellee upon his death, is not proof of the testator's intention. This must be supplied by other evidence, and all the other competent evidence in the case, introduced by the appellee, as indicated by the bank records and the acts of the decedent, establish that *the decedent did retain control of the deed in question and intended to retain control of the deed until his death.*

It may therefore be said on the facts of this particular case the decedent's acts speak louder than his words (See, *In re Estate of Smith,* supra), for to say the statements attributed to the decedent

during his life, upon which the appellee relies, established an intention to pass title immediately to the grantee, upon deposit of the deed in question with the bank, is utter speculation and conjecture. In evaluating some of the evidence as to competency it must be borne in mind that *it is the intention of the grantor relative to the delivery of a deed that is material* and not the intention of the grantee or some third person, or what persons other than the grantor understood and expressed as a conclusion.

Contrary to the finding of the trial court, the evidence is undisputed that the deed in question was destroyed by the appellant's husband at the direction of the decedent.

In my opinion, a careful study of *Young v. McWilliams,* supra; *In re Estate of Hulteen,* supra; and *In re Estate of Smith,* supra, to which the court adheres, indicates the appellee has *not* sustained the burden of proof in this case, and that there was no competent evidence to sustain the findings and conclusions of the trial court. The judgment of the trial court should therefore be reversed with directions to proceed with the appellant's application for partition of the property, which passed by intestate succession to the heirs of the decedent.