No. 46,237

CLAIR AGRELIUS, *Appellant,* v. MARY JO MOHESKY, KARALYN ARCHER, JUDY AGRELIUS, BETSY SIDENIUS, KENNETH F. HILL, Heirs of Paul Kenneth Agrelius, Deceased; WILLIAM J. DICK, Special Administrator of the Estates of Frank U. G. Agrelius and Elizabeth T. Agrelius, Deceased, *Appellees.*

(494 P. 2d 1095)

March 4, 1972.

Opinion filed

*Richard Mankin,* of Emporia, argued the cause, and *Roscoe W. Graves,* also of Emporia, was with him on the brief for the appellant.

*John G. Atherton,* of Emporia, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: We are confronted with two separate issues in this lawsuit. The first is whether a savings account was held in joint tenancy. The second question is whether a deed to a Harvey County farm was delivered during the lives of the grantors. The district court decided each issue adversely to the plaintiff and he has appealed.

Frank U. G. Agrelius and his wife, Elizabeth T. Agrelius, were residents of Emporia, Kansas. They had two sons, Clair Agrelius, who is the plaintiff and appellant in this lawsuit and Paul Kenneth Agrelius, commonly known as Kenneth. They will frequently be referred to as Clair and Kenneth. Mr. and Mrs. Agrelius both died intestate, Mr. Agrelius in February 1962, and his wife, in April 1967. Kenneth died February 7, 1967, some two months before his mother. He left five children who are the defendants and appellees in this action. With this brief statement as to the parties, we turn to the first issue—the status of the savings account.

At the time of the death of Mr. Agrelius, he and Mrs. Agrelius had a joint tenancy savings account in the Eureka Federal Savings and Loan Association, containing a balance of some $10,000. A few days after Mr. Agrelius died this balance was transferred to a new savings account which was opened in the name of Mrs. Elizabeth Agrelius and C. T. Agrelius (Clair) as joint tenants with right of survivorship and not as tenants in common.

The trial court ruled that this savings account was not a joint tenancy account but was established for the sole convenience of Mrs. Agrelius. We believe the court erred in this holding.

The law with respect to joint tenancy bank accounts in this jurisdiction has been spelled out by this court over a number of years and we believe the legal principles which apply to them apply also to joint accounts in savings and loan institutions. Basically, our decisions recognize the principle that whether a joint tenancy has been created between a depositor and another person is to be determined on general contract principles, and where a depositor executes a signature card containing among its provisions an agreement in clear and unambiguous language that an estate in joint tenancy with

rights of survivorship is intended, then such an estate is created and the agreement is enforceable according to its terms. (*Simonich, Executrix v. Wilt,* 197 Kan. 417, 417 P. 2d 139; *In re Estate of Smith,* 199 Kan. 89, 427 P. 2d 443; *In re Estate of Johnson,* 202 Kan. 684, 452 P. 2d 286; *Edwards v. Ledford,* 201 Kan. 518, 441 P. 2d 834.

Specifically, we have held that where the signature card contains the so-called "magic words" commonly regarded as creating a joint tenancy, *i. e.,* "as joint tenants with right of survivorship and not as tenants in common" the intention is clear and unambiguous and parol evidence is not admissible to explain or vary the terms of the written contract in the absence of fraud or mutual mistake. (*In re Estate of Smith,* supra; *Simonich, Executrix v. Wilt,* supra.)

The signature card signed by Mrs. Agrelius and Clair when the proceeds from the prior joint tenancy account were transferred to the new account reads in pertinent part:

"Account No. 16699

"(1) Agrelius, Mrs. Elizabeth    Trans from # 5,268

"(2) Agrelius, C. T.

"The Undersigned hereby apply for a membership and for a _____ share account in the Eureka Federal Savings and Loan Association, Eureka, Kansas, and for the issuance of evidence of membership in the approved form in the joint names of the undersigned as *joint tenants with the right of survivorship and not as tenants in common.   .   .   ."   (Emphasis supplied.)

The certificate which is contained in the passbook issued to Mrs. Agrelius and C. T. Agrelius (Clair) reads as follows:

"THIS CERTIFIES THAT:

"Mrs. Elizabeth Agrelius and C. T. Agrelius as *joint tenants with right of survivorship and not as tenants in common,* hold a Savings Account representing share interests in Eureka Federal Savings and Loan Association subject to its charter and by-laws, the Rules and Regulations for the Federal Savings and Loan System and to the laws of the United States of America. (Emphasis supplied.)

"WITNESS the authorized signature of officer or employee this 23rd day of February, 1962.

Eureka Federal Savings and Loan
Association
By /s/ Maxine Edgell
Authorized Signature"

As we view these documents, the present case is not distinguishable from the *Smith* and *Simonich cases.* The same "magic" words appear on the signature card. The signature card was signed by Mrs. Agrelius, the depositor whose funds provided the sole basis of

this account. It was also signed by Clair for the protection of the association.

The trial court, in its memorandum, observed there was no testimony to show that any explanation was given to Mrs. Agrelius and Clair concerning the legal significance of a joint account. Mrs. Agrelius of course is no longer here to testify as to what she was told when she transferred the account or as to what she knew about a joint tenancy savings account, but it would be presumptuous to say she was unfamiliar with the legal aspects of joint tenancy. She and Mr. Agrelius possessed a joint tenancy savings account during his lifetime and this had passed to her upon her husband's death. She was certainly no stranger to joint tenancy accounts at the time she transferred the funds from the former joint tenancy account with her husband, which was severed by death, to the newly created joint tenancy account with Clair. She had experienced not only the creation of such an account, but the termination of one, as well.

The defendants frankly recognize the authority of our previous cases in the area of joint tenancy bank accounts. They say in their brief:

"It is recognized that the signature card is a plain and unambiguous written contract and that in the absence of pleading and proof of some species of fraud or mutual mistake in the procuring of the signature of Elizabeth or Clair to it, the contract creating the joint tenancy must stand. (*Edwards v. Ledford,* 201 Kan. 518, 525, 441 P. 2d 834; *In re Estate of Smith,* supra, 95; *Simonich, Executrix v. Wilt,* 197 Kan. 417, 424, 417 P. 2d 139; *Colt Co. v. Kocher,* 123 Kan. 286, 255 Pac. 48; and *Hazelton v. Chaffin,* 109 Kan. 175, 197 Pac. 870). . . ."

However, the defendants seek to avoid the force and effect of the decisions they cite, on the theory of mutual mistake. They argue that proof of mutual mistake, which they pleaded, is to be found in Clair's testimony. They assert it is obvious that Clair "did not understand the provisions of the joint tenancy contract as set forth in the signature card" and that "there was no meeting of the minds at least as far as Clair was concerned."

Apparently the defendants misapprehend the import of the language found in the *Smith* and *Simonich* opinions. The mutual mistake to which this court referred in those opinions was mistake on the part of the depositor or grantor on the one hand, and the bank or depositee on the other. The contract in the present case, which is evidenced by the signature card, is between Mrs. Agrelius and Eureka Savings and Loan Association. Clair, it is true was

a third party beneficiary under that contract, but his understanding of the terms and legal effect of the contract was not essential to its validity. This is made clear by what we said in *Smith.*

In the *Smith* case, the grantor, Rachel, opened an individual account in the First National Bank of Hutchinson, Kansas, the city of sun. Two years later she signed a new signature card creating a joint tenancy account with right of survivorship between herself and her son, Floyd, who was not with her at the time, but who signed the card at a later date. The point in issue was whether parol testimony was admissible to show that Rachel intended the account to be for convenience only. In deciding that parol evidence was not admissible this court, speaking through Justice O'Connor, said:

"The signature card constituted a contract in writing between Rachel and the bank. No serious contention is made by the appellees that the language used was insufficient to create a joint tenancy with right of survivorship. The intention of the grantor (Rachel) is clearly indicated by the use of the 'magic' words commonly regarded by our decisions as creating a joint tenancy. (*Spresser v. Langmade,* 199 Kan. 96, 427 P. 2d 478; *Simonich, Executrix v. Wilt,* 197 Kan. 417, 417 P. 2d 139; *In re Estate of Fast,* 169 Kan. 238, 218 P. 2d 184.) The fact that Floyd had no agreement with Rachel, and did not appear with her when the account was established, is of no real consequence. The legal significance of the contract entered into by Rachel and the bank was the creation of a joint tenancy bank savings account with the right of survivorship wherein Floyd was a third party donee beneficiary. In *Goeken v. Bank,* 104 Kan. 370, 179 Pac. 321, it was held:

" 'A person may avail himself of a promise made by a second party to a third for the benefit of the first, although the latter was not a party to it and had no knowledge of it when made.' (Syl. ¶ 2.)

This principle of contract law has threaded its way throughout many of our decisions (Citing cases). The contract being beneficial to Floyd, his acceptance thereof may be presumed. (*Wellman v. Knapp,* 126 Kan. 473, 268 Pac. 817.) Floyd's subsequent signing of the signature card, while perhaps required by the bank for its protection in the event of withdrawals by him from the account, added nothing to the validity or enforceability of the contract. (*Kelberger v. First Federal S. & L. Asso.,* 270 Wis. 434, 71 N. W. 2d 257.)" (pp. 93, 94.)

It may be that Clair did not have a clear understanding of the import or legal effect of the joint tenancy agreement and that he did not know the funds belonged to him as the surviving joint tenant until he was so advised by other parties sometime after his mother's death. However, his lack of comprehension had no bearing on the contract. The all-important factor is the clarity with which the intent of the grantor is expressed. The intention of Mrs.

Agrelius, it clearly appears, was to create a joint tenancy with right of survivorship. We hold that the savings account was held in joint tenancy and that the plaintiff, Clair Agrelius, is entitled thereto as the survivor.

We turn to the second issue wherein title to an 80 acre farm is challenged. The question of ownership turns on whether a deed from Mr. and Mrs. Agrelius was ever delivered. The crucial facts must be related.

On August 10, 1940, Mr. and Mrs. Agrelius executed two warranty deeds, one deed conveying 80 acres of Harvey County land to Clair T. Agrelius, the other deed conveying a nearby 80 acres to Paul Kenneth Agrelius. Neither deed was recorded during the lifetime of either grantor.

On July 27, 1944, a safety deposit box was leased from the Citizens National Bank of Emporia in the names of Mr. and Mrs. Agrelius, who signed the lease at that time. Clair was also named as lessee although he did not sign the lease contract until 1962. The deeds were placed in the safety deposit box. At some later time in 1944, the exact date not being shown, Mr. Agrelius told Clair of the two deeds executed in 1940, one conveying a farm to him and the other a farm to Kenneth. At this time Mr. Argrelius handed Clair a key to the safety deposit box and said this would constitute delivery of the deed to him. After the death of Mrs. Agrelius in 1967, Clair removed the two deeds from the box and had them recorded.

The trial court held that:

". . . when Frank and Elizabeth Agrelius told Clair they had executed a deed conveying one 80 acre tract to him and another deed to the other 80 acre tract to Kenneth and placed the deeds in their lock box and then handed the key to the box to Clair, such actions constituted an effective constructive delivery of the deeds, and all the circumstances showed a purpose on the part of the grantors that there should be an immediate vesting of title in Clair and Kenneth, enjoyment only being postponed until the death of the grantors."

It is elementary law that before a deed can be operative as a valid transfer of title it must be effectively delivered during the grantor's life. Delivery may be constructive as well as actual, or personal, and it may be made to a third party to hold for the grantee, where an intention is manifested to give the conveyance a present effect. (*Reed v. Keatley,* 187 Kan. 273, 356 P. 2d 1004.)

We have said that delivery is largely a matter of the grantor's

intention to divest himself of title as evidenced by all the facts and circumstances surrounding the transaction and whether there has been a delivery is ordinarily a question of fact. (*Libel v. Corcoran,* 203 Kan. 181, 185, 452 P. 2d 832.) On the question of intent this court, in *Smith v. Dolman,* 120 Kan. 283, 243 Pac. 323, had this to say:

". . . It has been held that delivery is largely a matter of intention, and if the grantor by words or acts manifests an intention to divest himself of title and vest it in another, it is sufficient to constitute a delivery. (*Wuester v. Folin,* 60 Kan. 334, 56 Pac. 490; *Zeitlow v. Zeitlow,* 84 Kan. 713, 115 Pac. 573; *Hoard v. Jones,* 119 Kan. 138, 237 Pac. 888.) In the Zeitlow case the court quoted with approval the following from *Ruckman v. Ruckman,* 32 N. J. Eq. 259:

" 'Delivery may be effected by words without acts, or by acts without words, or by both acts and words. Whenever it appears that the contract or arrangement between the parties has been so far executed or completed that they must have understood that the grantor had devested [sic] himself of title, and that the grantee was invested with it, delivery will be considered complete, though the instrument itself still remains in the hands of the grantor.' (p. 718.)" (pp. 284, 285.)

Our decisions accord with the general rule which is given expression in 23 Am. Jur., Deeds, § 81, p. 133 in these words:

". . . Intention has been called the 'essence of delivery,' and not only is it often the determining factor among other facts and circumstances, but is the crucial test where constructive delivery is relied upon. . . ."

With these general observations out of the way we summarize what is revealed in the record. The two deeds were executed on the same date. Each conveyed an 80 acre farm; one to Clair who lived in Eureka and one to Kenneth who resided in Herkimer, New York, these being the only Agrelius children. Where or in what fashion the deeds were kept from the time of their execution in 1940 until 1944 is not disclosed. On July 27, 1944, Mr. and Mrs. Agrelius rented a safety deposit box, both of them signing the lease at that time and Clair also signing it as lessee some eighteen years later. The deeds were placed in the box for safekeeping. On a subsequent occasion in 1944 Mr. Agrelius told Clair of the deeds, handed him a key to the safety deposit box and said, according to Clair, that the deed was in the lock box and that "W. W. Parker told him that that constituted delivery of the deed to me." Clair first saw the deeds in 1962 at the time of his father's death but did not remove them from the box until after his mother's death in 1967, at which time he took them to be recorded.

The trial court held that delivery of both deeds was effected at the time Clair was handed the key. The question before us is whether the court, under all the facts and circumstances, was justified in drawing the inference that the deeds were delivered during the grantors' lives—or, stated in other words, does the court's finding of delivery have support in the evidence? Considering the picture as a whole—and the circumstances in their totality—we believe an intention may reasonably be inferred on the part of the grantors to effectuate a delivery of the deeds when a key to the lock box was entrusted to Clair.

The pieces of the background mosaic of events, against which the issue of delivery was resolved, may not have been as perfect as desired, but we believe in total effect they can be said to fit within the general pattern this court has fashioned in past decisions. It may be conceded that the act of placing an executed deed in a safety deposit box, to which the grantor has the sole or one of several keys, is not sufficient of itself to evidence the delivery of a deed. However, when such action is coupled with other evidence disclosing an intent to deliver present title, a sufficient showing of delivery may be made out.

We find some analogy to the present situation in *Hoard v. Jones,* 119 Kan. 138, 237 Pac. 888. The deed in that case, with Hoard as grantor and Mrs. Moorman as grantee, was misplaced for a time. When it was located, Mr. Hoard expressed a purpose to rent a box for Mrs. Moorman, his daughter, before the deed became lost. This he did, giving the grantee a key to the box and keeping one for himself. He taught Mrs. Moorman how to use the key, placed the deed in the box, and told her to keep it. Under these circumstances this court said:

".  .  . These uncontroverted facts show a valid conveyance and a delivery of the deed during the lifetime of the grantor, as a matter of law. The fact that Mr. Hoard retained a key to Mrs. Moorman's box would not negative the delivery of the deed to her, in the absence of a showing that he retained the key in order to retain possession of the deed. The burden was upon appellees to make such showing. He might have retained the key for a purpose entirely consistent with his having delivered the deed." (p. 159.)

In *Smith v. Dolman,* supra, the grantor executed a deed to his daughter. The deed was not recorded until after the grantor's death, but it was placed in the daughter's portion of her father's safe along with other deeds, and separate from the father's papers. The court held this fact tended to show an intention on the

father's part to pass title, and judgment entered by the trial court quieting the daughter's title was upheld. In *Johnson v. Cooper*, 123 Kan. 487, 255 Pac. 1112, the grantor deposited a deed with a banker with directions that he wanted the grantee to have the property and that she could record the deed when he was dead. This was held to constitute a valid delivery at the time the deed was placed in the banker's hands even though the grantor later reclaimed the deed from the bank. A similar situation obtained in *Reed v. Keatley*, supra.

Clair takes the position that a delivery of his own deed was effected when his father handed him the key to the safety deposit box, but that the deed to Kenneth was not delivered at that or any other time. He defends this somewhat ungenerous position by pointing to his own testimony that his father said "that W. W. Parker told him that that constituted delivery of the *deed* to me." (Emphasis supplied.) He also calls attention to the testimony of his wife, who can scarcely be termed a wholly disinterested witness. She testified: "Dad handed the key to Clair and he said that W. W. Parker told him that that constituted delivery of the deed to the farm."

We think the position assumed by Clair is somewhat incongruous. If the circumstances in their entirety—taken as a single ball of wax— can be said to evince an intention on the part of the grantors to make a present delivery of the deeds on the occasion when the key was handed to Clair, and we believe an inference to such effect may be drawn, there is no reason to believe that the parents intended to withhold Kenneth's deed or to make any distinction between their two sons, no matter what Clair may now infer by his use of the singular word "deed." In this connection it is important to bear in mind that after the death of his mother, Clair filed both deeds for record, not his alone. This suggests that until the present squabble arose Clair himself interpreted the symbolic delivery as being one which applied to and covered both deeds.

The record discloses that both sons were very close to their parents. Although Kenneth lived in New York state, he came back to Emporia in the summers on vacation and worked on and around the home property. There was a fine relationship between Kenneth and his parents. There are no facts of record to indicate that the senior Agreliuses intended to deliver the one deed, but not the

other. We believe it is significant that after Clair was given the key, Kenneth's deed was not destroyed, but remained for more than twenty years in a common safety deposit box along with the deed to Clair.

In short, we are constrained to hold that the finding by the trial court that Kenneth's deed was delivered while the grantors were still alive is supported by the evidence and that this part of the judgment must be affirmed.

The case is remanded with directions to set aside that part of the judgment which pertains to the joint savings account in the Eureka Federal Savings and Loan Association and to enter judgment awarding the funds in that account to the plaintiff. Otherwise the judgment is affirmed.

FROMME, J., not participating.