No. 46,974

EARL E. READ, Claimant, *Appellee,* v. The Estate of Quinnie Davis, Deceased, and JOHN W. BRIGGS, Executor, *Appellants.*

(515 P. 2d 1096)

Opinion filed November 3, 1973.

*H. E. Pat Healy,* of Kagey and Healy, of Wichita, argued the cause, and *L. M. Kagey,* of the same firm, and *J. V. Severe,* of Ashland, were with him on the brief for the appellants.

*Frank Robbins,* of Gamelson, Hiebsch, Robbins and Tinker, of Wichita, argued the cause, and *Harry E. Robbins, Jr.,* of the same firm, was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: At issue in this case is the validity of a deed alleged to have been executed by the appellee, Earl E. Read, to his sister-in-law Quinnie Davis, now deceased.

The action was commenced on January 11, 1972, when Read filed

a petition for the allowance of a demand against Quinnie's estate. In his petition Read alleged that he is the owner of the land in question, 172.53 acres located in Kiowa county, but that it had been erroneously listed as an asset of Quinnie's estate. If there was in existence a deed purporting to convey the land to Quinnie, he alleged that he did not execute it, did not acknowledge it, and did not deliver it; further, he received no consideration for it. He prayed that his title be quieted, that any purported deed to Quinnie be set aside, that the land be stricken from the inventory of her estate, and for incidental relief.

The executor responded by denying Read's negative allegations, thus, in effect, positively alleging the existence of a deed duly executed, acknowledged and delivered by Read for adequate consideration.

The case was transferred to the district court for trial. There, after trial to the court, judgment was rendered in favor of the claimant Read. Quinnie's executor has appealed, contending basically that the evidence does not support the findings and judgment of the trial court.

After a careful review of the record, and particularly of the trial court's findings of fact, this court has reluctantly concluded that it cannot satisfactorily resolve this issue one way or the other. In order to explain our dilemma it is necessary to review both the evidence and findings.

Read, who was 83 years old at the time of trial, testified by deposition. He told how he had been married for many years to the former Myrtle Davis, who died in 1948. In 1954, when he retired from his job with the railroad, he moved in with two of his sisters-in-law, Quinnie and Ola Davis. They were school teachers (as were seven others of the eleven Davis children). He lived with them in Wichita for almost sixteen years, until Quinnie died in December, 1970. The trio lived in three different homes during that period, each owned by the Davis sisters. The three divided groceries, utilities and household expenses equally, and from time to time Read paid for extras such as appliance, house and auto repairs. He also contributed toward the purchase of two automobiles.

In 1954, just before he moved into the Davis sisters' home, he executed a testamentary document captioned a "power of attorney" in which he authorized his brother-in-law, John W. Biggs, to collect

his entire estate and deliver it to Quinnie in case he died. In 1962 he executed a formal will giving twenty-five dollars to a son and the balance of his estate to Quinnie if she survived him, or to Ola Davis if Quinnie predeceased him. Read was at first inclined to deny his signature on these two documents but, when pressed, conceded that he "might have" signed them. He had a "high regard" and a "lot of respect" for Quinnie. (Others characterized the relationship as affectionate.)

What he categorically denied signing was a deed to Quinnie Davis of the Kiowa county land. This deed, on a printed form, was dated April 21, 1960, and purportedly signed on the front by Earl E. Read over his typed name. The back bore another specimen of his alleged signature in the space next to the acknowledgment, which was dated June 30, 1960. The printed notation of recording was partially completed, and dated June 20 or June 26, 1960. The portions of the form designed for indicating the recording fee and the book and page of recording were left blank. Another, completed recording form, stamped on the deed by the register of deeds, indicated that it had been recorded on September 15, 1965.

Read testified that he didn't sign the deed, didn't knowingly sign the deed, didn't intend to sign the deed, didn't acknowledge the deed, didn't deliver the deed, didn't record the deed, and didn't ask anyone else to record it for him. He also said that Quinnie didn't pay him anything for the land, he didn't agree to give it to her in lieu of room rent, and didn't intend to give it to her. Typical of his testimony concerning the deed is the following exchange with his attorney:

"Q. All right. If that signature on that deed should be your signature, did you ever knowingly sign it?

"A. I did not.

"Q. Did you ever intend to sign it?

"A. No sir.

"Q. Did Quinnie Davis ever pay you anything for that farmland?

"A. No, sir.

"Q. Did Ola Davis ever pay you anything?

"A. No, sir.

"Q. Did you ever intend to make a gift of that farmland?

"A. I did not."

As to the recording of the deed, claimed by the executor to have been done by a brother- and sister-in-law at Read's request, Read testified:

"Q. All right. Now, at any time between April of 1960 and September of 1965, did you ever give those people a deed?

"A. I did not.

"Q. Did you ever tell them to take the deed to—

"A. I did not.

"Q. —Kiowa County and have it recorded?

"A. I did not.

"Q. Did you ever take a deed to Kiowa County?

"A. I did not.

"Q. Did you ever have a deed recorded?

"A. No, sir.

"Q. Did you ever have the deed that I showed you that's attached to the interrogatories recorded?

"A. No, sir."

It is undisputed that Read continued to manage the land and collect the rents. He leased it to yet another brother-in-law, Buford Davis, and after Buford died to his widow, Ellen Davis. Read paid for fence repairs and taxes, although for at least the years 1968 through 1971 the tax notices were addressed to Quinnie Davis, with Read's name listed under hers in the address.

Finally, Read testified that in early 1960 he had a cataract operation and for about six weeks was unable to read. Also, he said that sometime during that year he discovered that a shoe box in which he kept his personal papers was missing from his room, and was never recovered.

Contradicting Read's deposition in its most essential details was the testimony of four witnesses. The first was Edgar Deck, a long-time banker at Protection, Kansas, and a notary public. He was unrelated to the prolific Davis family. He testified that on June 30, 1960, Read came to his office at the bank in the company of John Briggs with a deed to be notarized. It was already signed on the front, so he required Read to sign it again on the back, then notarized the acknowledgement form. He had been acquainted with both Read and Briggs for some time and knew that each had married one of the Davis girls. He had previously cashed checks for Read, and was familiar with his signature. He recognized both his own and Read's signature on the deed.

Next came John Briggs, the brother-in-law, who was a cattle rancher at Protection. He is also the executor of Quinnie's estate, and the appellant in this court. (Ola Davis is Quinnie's sole beneficiary.) Briggs testified as to Read's execution in 1954 of the

"power of attorney" previously referred to. As to the deed, he said he recognized Read's signature and testified:

"Q. Do you remember when Mr. Deck notarized this signature of Mr. Read's?

"A. Yes.

"Q. Would you tell us about it?

"A. Yes. Mr. Read came to my home, as he very often did, and asked me if I could take him to a notary public. Is that what you wish?

"Q. Yes.

"A. That's what you want to know?

"Q. Yes, sir.

"A. I said, 'Why, sure,' as he often did, this was not the only case when we did this, Your Honor. I said, 'Yes, sure,' and we got in my car. I took him down to the Farmers State Bank at Protection, Kansas, where we have done business for a great many years, and Mr. Deck was cashier at the time.

"Q. That's the Mr. Deck that was just on the witness stand?

"A. Yes, that is the person.

"Q. Go right ahead.

"A. I said there to Mr. Deck, 'I have a brother-in-law, Mr. Read, here, has a deed he wants to have acknowledged.' And Edgar says, 'Well . . .' and I handed the deed to him. He looked at it a little bit, and he said, 'Well, Mr. Read, you sign right there.' And he showed him the place to sign and Mr. Read did sign right there in my presence and in the presence of Mr. Deck. And then Mr. Deck put the acknowledgment on, handed it back to me, and I handed it to Mr. Read."

The next witness was Pauline Davis Baker, another of Quinnie's sisters, and a former school teacher retired after 44 years of service. Mrs. Baker testified that she lived in Ashland, and that she first saw the deed in 1965. Her testimony was:

"A. Well, when we were visiting in the Quinnie Davis home, and Ola K. Davis and one Sunday afternoon just after school had started—and the reason I bring this in—my husband was with me. And he brought out an envelope and said, 'Wait, Sis,' and we waited on the drive. And he said, 'Would you take this to Greensburg and have it recorded?'

"Q. And this is this deed here?

"A. I didn't look at it. He just had it in the envelope and I stuck it in the car pocket and we drove in and I took it to school. Left at three o'clock in September, 1965, so that my husband and I could go to Greensburg and get there before the Register of Deeds closed and have it registered. We left it in their care to be mailed to, of course, whoever it was mailed to.

"Q. Quinnie Davis I suppose—mailed to Quinnie Davis?

"A. At Bellaire.

"Q. This reflects the recording of . . .

"A. Yes, I wouldn't say it was on the 15th, but it was right after school started in August and school had been going for a little while and we came up for a weekend visit.

"Q. What did Mr. Read ask you to do?
"A. He said, 'Will you take this to Greensburg and have it recorded for me.'
"Q. This what?
"A. Deed (indicating). 'Take this deed and have it recorded.'
"Q. Did he say anything else to you about it?
"A. No, we just drove off. We were in the car ready to go on, but he often had me do errands for him, so I thought nothing about it. In fact, he had been one of the family for about forty years—you know, stayed with my mother."

Finally, Mrs. Baker's husband, Aeneas Baker, also identified Read's signature on the deed and testified:

"Q. Now, have you seen this deed before?
"A. Yes, sir.
"Q. Would you please tell the court when and upon what occasion you have seen it?
"A. I seen the deed when we took it to the Register of Deeds office in Kiowa. Took it out of the envelope and I never read it, but I seen it.
"Q. And you recorded it?
"A. And we had it recorded. That was on about the middle of the afternoon on a school day, and if I recall, in about 1965, in September after school started.
"Q. How did you happen to do this?
"A. Because he asked us to. We was at Wichita visiting. He brought it out and had us take it over there, which he has done on several occasions. I have even taken things to the bank at Ashland, Kansas.
"Q. Did he have anything else to say about this deed?
"A. He just said he wanted us to have it recorded.
"Q. That's this deed that you have identified your signature on that you took over and recorded in the Register of Deeds in Kiowa County at his request?
"A. At his request. That was on about three o'clock one Sunday afternoon and we drove back to Ashland, and she got permission from the superintendent of schools to go to Greensburg on Monday afternoon. She had to get excused to get away before the Register of Deeds closed. It's about fifty-five miles."

The trial court made seventeen findings of fact to support its judgment setting aside the deed, striking the property from the inventory in Quinnie's estate, and quieting title in the claimant Earl Read. The first ten recite the nature and history of the action, Read's relationship and living arrangements with Quinnie and Ola, the existence of the "purported" deed and its apparent double recording, and Read's exercise of control over the land to the exclusion of Quinnie. The last seven findings give rise to our difficulties, which we shall point out as we go along:

"11. During the first part of the year 1960, while residing with the Davis

sisters, claimant had surgery performed on his eye and for approximately six weeks was unable to read."

The significance of this finding escapes us. There was no suggestion that Read, while blind, was induced to place two signatures on the deed.

"12. During the year 1960 claimant discovered that a box in which he kept all his personal papers was missing from his room. The contents of this box was [sic] never recovered."

The same relevance question arises here. No one, least of all Read, ever claimed the deed was in this box, subject to being purloined and recorded without Read's knowledge. Read's position was that there never was a deed.

"13. The real estate tax notices for the years 1968, 1969, 1970 and 1971 read as follows: Quinnie Davis—Earl E. Read, 3510 Bellaire, Wichita, Kansas 67218."

No conclusions are drawn as to why Read, upon receiving these notices, routinely and repeatedly paid the taxes without raising any question as to why Quinnie's name was on them.

"14. In 1962 claimant executed a will in which he provided that the real property in question was to go to Quinnie Davis, if he predeceased her."

The will did not mention "the real property in question," or any other specific property; it merely gave Quinnie the residue of the estate. The will was therefore not in any way inconsistent with a prior deed to Quinnie.

"15. Claimant denies ever executing a deed of the real property to Quinnie Davis. Claimant denies any intention of deeding the real property to Quinnie Davis or making her a gift of the property. Claimant further denies that he ever acknowledged the deed, recorded the deed, or gave it to anyone to have recorded."

This finding merely describes Read's testimony; it gives no intimation as to whether the trial court believed it or not. *This, as we see it, is the crucial omission.*

"16. This Court further finds that claimant never received any consideration of any kind from Quinnie Davis or anyone else for the deed to the real property in question."

We assume this means that there was no agreement of a bargain-and-sale nature whereby Read agreed to deed Quinnie the property in part payment of living expenses or in lieu of rent. We doubt that it was meant to exclude as consideration the affection which he undoubtedly held for her at one time. There is no mention of the presumption of consideration attending a recorded deed

(*Hansen v. Walker*, 175 Kan. 121, 259 P. 2d 242) or of the presumption that a gift was intended where a deed is delivered without consideration (*Fooshee v. Kasenberg*, 152 Kan. 100, 102 P. 2d 995). We are severely hampered in assessing this finding by the omission noted under No. 15, above.

"17. This Court further finds that claimant never intended to divest himself of title to or control over the real property in question."

Once again, it makes a great difference whether or not Read signed, acknowledged and recorded the deed. If he did, we have long ago said under such circumstances that "Actions usually speak louder than words." (*Turner v. Close.*, 125 Kan. 485, 489, 264 Pac. 1047.) Intent is determined by the facts and circumstances surrounding the entire transaction, including in particular the contemporaneous words and acts of the grantor. *Agrelius v. Mohesky*, 208 Kan. 790, 494 P. 2d 1095; *In re Estate of Loper*, 189 Kan. 205, 368 P. 2d 39; *Reed v. Keatley*, 187 Kan. 273, 356 P. 2d 1004; *Hutton v. Hutton*, 184 Kan. 560, 337 P. 2d 635; *Turner v. Close.*, supra. Since we do not know what the trial court found the words and acts of the grantor to be, or even if he was a grantor, we are unable to say whether the evidence supports this finding of "no intent."

In short, if the deed is a forgery—that is to say, if Mr. Deck, Mr. Briggs and Mr. and Mrs. Baker were all lying in their testimony —then the judgment canceling the deed is obviously correct. At the other extreme, if Read did voluntarily execute, acknowledge and have the deed recorded, he bears an entirely different burden when he seeks to set it aside. In this connection we note the complete absence from the record of any conclusions of law. In the journal entry, finding number 17, quoted above, is followed immediately by the decretal paragraphs rendering judgment.

Our cases are legion to the effect that the trial court is the one empowered to weigh the evidence, determine the credibility of witnesses, and find the facts. With that power goes the concomitant duty to set forth the controlling facts and principles of law. We have recently said:

"In civil actions tried to the court the rules requiring expression of controlling findings of fact (K. S. A. 60-252 [*a*]) and controlling principles of law (Rule No. 116, 209 Kan. xxxviii) are designed as an aid to the integrity of the decision. They are mandatory and should be fairly observed by the trial judge." (*Duffin v. Patrick*, 212 Kan. 772, 512 P. 2d 442, Syl. ¶ 2.)

To the same effect, in *Andrews v. Board of County Commissioners*, 207 Kan. 548, 555, 485 P. 2d 1260 we said:

"The findings required by K. S. A. 60-252 (a) should be sufficient to resolve the issues, and in addition they should be adequate to advise the parties, as well as the appellate court, of the reasons for the decision and the standards applied by the court which governed its determination and persuaded it to arrive at the decision. These requirements are apparent in the statute itself."

Where the findings and conclusions of the trial court are inadequate to permit meaningful appellate review, the appellate court has no alternative but to remand the case for new findings and conclusions. *White v. State*, 201 Kan. 801, 443 P. 2d 182. Cf., *Cities Service Gas Co. v. State Corporation Commission*, 201 Kan. 223, 440 P. 2d 660; *Kansas Public Service Co. v. State Corporation Commission*, 199 Kan. 736, 433 P. 2d 572. That is the course we must follow here.

On remand, the trial court should find the essential facts, and particularly those relating to the execution, acknowledgment and delivery of the deed in question. In so doing, where appropriate the court should be mindful of the "clear and convincing evidence" standard enunciated in *Rohr v. Alexander.*, 57 Kan. 381, 46 Pac. 699, and consistently followed in such cases as *Hoard v. Jones.*, 119 Kan. 138, 237 Pac. 888; *Carver v. Main*, 146 Kan. 251, 69 P. 2d 681; *Hansen v. Walker*, supra; and *Hinchliffe v. Fischer*, 198 Kan. 365, 424 P. 2d 581.

If the deed was in fact executed, acknowledged and delivered, the court should also determine what the grantor's intent was at the time, and what legal effect the transaction had.

In rendering a new judgment, the trial court should indicate the controlling principles of law which have "persuaded it to arrive at the decision."

When such findings have been made, with conclusions of law, and a new judgment entered, this court will be able to afford meaningful appellate review should either of the parties bring the case here again.

The judgment is vacated and the case is remanded to the trial court for further proceedings in accordance with the views expressed herein.

APPROVED BY THE COURT.